**Norman H. MARLOWE et al., Plaintiffs,**

v.

**Robert F. MARLOWE et al., Defendants.**

**Civ. A. No. 4667.**

United States District Court,
E. D. Virginia,
Alexandria Division.

Oct. 6, 1971.

Philip F. Herrick, Washington, D. C., for plaintiffs.

Mark B. Sandground, Washington, D. C., for defendants.

## MEMORANDUM OPINION

OREN R. LEWIS, District Judge.

This derivative suit was brought by three minority stockholders against the named corporations and individuals for the appointment of a receiver for the defendant corporations on the ground of gross mismanagement, fraud and misapplication of corporate funds—and for an order compelling the individual defendants to repay the corporations all moneys, including excess compensation, illegally taken.

To fully understand the matter, a brief history of the relationship between the parties is necessary.

The plaintiff's father, Robert F. Marlowe, created and began the development of National Memorial Park some forty years ago—The park is now owned and managed by the interlocking defendant corporations. Robert Marlowe is the chief executive officer and controlling stockholder. The plaintiff and his brothers are minority stockholders and employees of the corporations. The duties and responsibilities of the father and the sons are set forth in a so-called employment contract dated September 21, 1960—This contract superseded similar contracts made by the parties in 1955 and in 1958.

The plaintiff has worked for the corporations in various capacities during the past thirty years notwithstanding the many business disagreements he had with his father—He was removed as vice president in the early Sixties and was discharged June 25, 1966—He brought this suit shortly thereafter.

That the antipathy between the father and son still exists is best evidenced by what the plaintiff said about his father during the hearings in this case and in the suit he brought against the corporations in September of 1966.

The preliminary hearing in this case disclosed that the cemetery encompasses some 207 acres—165 acres of which are fully developed. There are about 250,-000 grave sites.

The income from sales exceeded a million dollars in 1969 and in 1970, most of which was for crypts, markers, and so forth, sold on a "pre-need" basis—Advance payments now exceed a million and a half dollars—No reserves have been set up to fulfill these contracts—They are fulfilled as and when needed out of current income.

The corporations resold cemetery lots on a commission basis. They did not remit to the sellers when and as the purchase money was collected. They owed some $47,000.00 as of the date of the initial hearing.

Contracts for the purchase of cemetery lots provided that ten per cent of the sale price be set aside for perpetual care—This was not done—The amount owed in 1963 exceeded $325,000.00—More than $200,000.00 was owed as of the date of this hearing. The corporations used these moneys to pay current

operating expenses and the officers' "override" sales commissions.

The corporate books have never been audited or certified by C.P.A. standards —The outside company auditors who prepared the annual statements and tax returns stated that they had never been requested to make a certified audit and doubted if one could now be made— There was no breakdown of the expenses charged to the maintenance fund—There were no records substantiating the estimated cost of fulfilling the "pre-need" sales contracts—There was no provision in the accounts receivable for estimated uncollectibles—There was no provision for deferred income taxes. Such financial statements and records as were available were not forthcoming until eight or nine months after the close of the fiscal year.

The evidence further disclosed that Robert Marlowe had used some thirty or forty thousand dollars of corporate funds to pay one of his son's hospital bills and that he was paying his former wife's alimony with corporate funds under the guise of rent. He claimed these items were to be charged to his commission earnings—There was also some evidence that corporate funds were paid to Walter Marlowe for architectural services that were never rendered, and that Eugene Marlowe was paid more than his services warranted; and that Robert Marlowe was drawing grossly excessive "override" sales commissions.

This being in the main a family dispute, a receiver was not then appointed —Instead, the Court appointed an independent certified public accountant with directions that he examine the books and records of the corporations and report to the Court the amount of money due the perpetual care trustees—the amount due the sellers of the resold cemetery lots— the prepaid "pre-need" sales together with the estimated cost of fulfilling these contracts—and the total amount of any and all personal obligations which had been charged to the corporations.

Pending this report, the Court orally directed that the Marlowes draw no further commissions.

Some sixty days later the auditors reported they were unable to determine the correctness of the information sought from the books and records of the corporations—and certainly not unless they spend an inordinate amount of time in attempting to reconstruct and justify the many items—The problem was, there were no detailed supporting records.

Further hearing was delayed to June 22, 1970 to give the corporations time to correct the deficiencies complained of and to establish a trust fund to insure fulfillment of the "pre-need" contracts.

The record here made discloses that the corporations reported on that date that they had paid the amount due the perpetual care trustee, absent accrued interest. (This was refuted, however, by the financial statement for the year ending December 31, 1970, which listed $46,096.00 as being owed to the perpetual care trustee as of that date.)

They also reported they had amended their agreement with the perpetual care trustee (the Northern Virginia Bank) as of March 14, 1970, a copy of which has been filed herein—and had entered into agreements with the Fairfax National Bank under dates of November 1, 1969 and May 5, 1970 creating a fund in the amount of $100,000.00 payable at the rate of $2,000.00 per month, as a reserve to insure fulfillment of the "pre-need" contracts as and when needed, copies of which have been filed herein.

No changes were made in the bookkeeping procedures or in the preparation of the annual reports—No provisions were made for periodic C.P.A. audits.

Robert Marlowe was paid $74,900.00 in 1969 and $61,537.00 in 1970—Walter Marlowe was paid $1,536.00 in 1969 and $17,615.00 in 1970—Eugene Marlowe was paid $11,399.00 in 1969 and $11,616.00 in 1970. The combined financial statements of the corporations showed losses for both of these years.

Considerable evidence was presented in re the so-called employment contract of September 21, 1960. This agreement was signed by Robert, Norman, Walter and Eugene Marlowe, individually, and by Robert Marlowe as president of each of the defendant corporations. It provides for the employment of each of the named Marlowes and fixes their duties and annual salary and commissions.

The rights of Norman Marlowe, the plaintiff here, under this agreement were terminated by this Court in Civil Action No. 4182 as of October 28, 1969.

Robert Marlowe's employment is for the remainder of his life, so long as he performs his obligations, at an annual salary of $14,500.00, plus a commission of eight per cent of net cash receipts from sales made prior to January 1, 1956—four per cent on sales made during 1956—and six per cent of net cash receipts from sales made after December 31, 1956.

Upon his death all commissions earned but not yet paid shall be paid as directed in his will, and if not so directed, to his daughter Elaine—Further, the corporations are required to pay $74,000.00 to his daughter Elaine or to her descendants—$5,000.00 to the children of Norman if they then be living—$150.00 a week for six years to his wife Cecelia—and two per cent of cash receipts from gross sales to Eugene Marlowe for the remainder of his life.

The corporations are further required to pay to Robert Marlowe's estate the fair value for his share in the Mausoleum and in the Memorial Park Corporation and $18,750.00 for his stock in Monticello Village—These corporate obligations on the death of Robert Marlowe total about $1,800,000.00—He is now in his eighties.

Walter Marlowe is paid certain fixed fees as the company architect. The claim that he was overpaid some $116,-000.00 for inspections not made cannot be determined until the books of the corporations have been audited.

Eugene Marlowe's salary is fixed at $10,000.00 per year—He gets no "override" commissions on sales until the death of his father. The record here made is not clear as to Eugene Marlowe's duties and responsibilities.

The corporate financial statements indicate that the corporations have rarely, if ever, made any profits—No dividends have ever been declared.

From these findings it is rather clear that these corporations are being run for the benefit of Robert Marlowe and selected members of his family—at the expense of the minority stockholders and to the detriment of the cemetery lot, crypt and marker owners.

Current operating expenses, including excessive sales commissions, have been paid out of moneys due the perpetual care trustee and out of moneys that should be set aside for the fulfillment of "pre-need" contracts.

Corporate funds have been used to pay personal obligations of some, if not all, of the officers of the corporations.

Corporate assets—cemetery lots and corporate moneys—have been used by both Robert and Norman Marlowe for personal gains.

Private resales receipts have been commingled with corporate receipts and used for corporate purposes.

Perpetual care payments have not been timely made.

Perpetual maintenance expenses have not been properly accounted for—There is no allocation of perpetual care and regular maintenance expenses.

The books and records of the corporations are not being kept in accord with standard accounting practices—with possible resultant State and Federal tax problems.

The belated reserve set up to fulfill "pre-need" contracts is insufficient to meet the needs at current costs.

Some of the foregoing acts constitute fraud and misconduct on the part of the corporate officers—and all of them constitute gross mismanagement of corpo-

rate business. See Penn v. Pemberton & Penn, Inc., 189 Va. 649, 53 S.E.2d 823 (1949).

There is no evidence in this case indicating that the present management can or will eliminate the wrongs above mentioned—Therefore it is necessary that a receiver-conservator be appointed with directions to determine and pay the amount due the perpetual care trustee and to determine and set aside the amount necessary to fulfill the "pre-need" contracts—and to determine what corporate assets, if any, have been converted to the use of any of the corporate officers and the profits made therefrom—A certified public accountant will be appointed to assist the receiver in the premises, if necessary. The receiver shall also review and make such changes in the corporate books and records as are needed for good corporate management.

■ The employment agreement of September 21, 1960 was not an arm's-length agreement between employer and employee—Although facially executed by the necessary corporate officers, it was in fact an agreement between Robert Marlowe, chief executive officer and controlling stockholder, and Robert Marlowe, personally, whereby he and certain members of his family would be paid excessive sale commissions during their lifetime and most of the assets of the corporations would be transferred to his estate or paid to his designees upon his death.

The agreement does not purport to make any of the corporate obligations mentioned therein contingent upon the earnings or the then net worth of the corporations—or subjects them to the payment of the "pre-need" and other corporate debts.

The defendants offered no justification for this employment agreement except that Norman Marlowe should be estopped from complaining because he had signed the agreement and had accepted his share of the benefits until this Court's October 28, 1969 ruling in Marlowe v. National Mausoleum Corporation, et al., Civil Action No. 4182.

The simple answer to this contention is—The agreement is not limited to the rights of Norman Marlowe—It impinges upon and vitally affects the rights of all of the minority stockholders, the "pre-need" purchasers and the creditors of the corporations.

No justification has been offered for the payment of the excessive "override" sales commissions to Robert Marlowe during his lifetime and to Eugene Marlowe upon Robert's death—or why they have been paid out of current sales income instead of out of earnings.

Corporate officers are fiduciaries—They cannot deal with corporate earnings or assets as though they were personally owned—such as was here done.

The employment agreement of September 21, 1960 will be declared invalid and of no effect, and the officers and employees of the corporations will be enjoined from making any further payments thereunder.

Whether Robert Marlowe will be required to return to the corporations the commissions drawn since the October 29, 1969 direction of this Court—and whether the corporations will be required to pay Norman Marlowe the sales commissions found to be due and payable in Civil Action No. 4182 will be reserved for further determination—depending upon the corporations' ability to promptly pay the amount owed the perpetual care trustee and to establish reserves sufficient to fulfill the "pre-need" contracts.

If counsel for the parties can agree upon the receiver and certified public accountant to be appointed herein, acceptable to the Court, the persons named will be appointed—otherwise the Court will make the appointments.

Counsel for the plaintiffs should forthwith prepare an appropriate order in accordance with this memorandum opinion, submit the same to counsel for the defendants for approval as to form, and then to the Court for entry herein.