456 F.2d 1303
 Ronald NOVAK, individually and on behalf of all others
similarly situated, and Fred Cruz, Petitioners-Appellants,
v.
Dr. George J. BETO, Director of the Texas Department of
Corrections, Respondent-Appellee.
 No. 31116.
 United States Court of Appeals,
Fifth Circuit.
 March 8, 1972.
 
 William Bennett Turner, San Francisco, Cal., Frances T. Freeman Jalet, Houston, Tex., for petitioners-appellants.
 Mario G. Obledo, Gen. Counsel, San Francisco, Cal. (Mexican American Legal Def.), amici curiae.
 Harrell Moore, Asst. Atty. Gen., Larry J. Craddock, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 (Opinion Dec. 9, 1971, 5 Cir., 1971, 453 F.2d 661).
 Before TUTTLE, THORNBERRY and INGRAHAM, Circuit Judges.
 PER CURIAM:
 
 
 1
 The Petition for Rehearing is denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is also denied.
 
 
 2
 TUTTLE, Circuit Judge (dissenting from the denial of rehearing).
 
 
 3
 Since I am not a member of the court in active service, I, of course, did not have an opportunity to vote on the grant or denial of the motion for rehearing en banc. I, therefore, am not able, technically, to concur in the dissenting opinion filed by Judge Wisdom from the denial of rehearing en banc. However, the court, as originally constituted, has also before it for consideration a petition for rehearing. The court, by majority vote, has denied this petition. I, therefore, register this dissent from the denial by the original panel of the court of the petition for rehearing on the grounds stated by me in my original dissent to the opinion of the court, and I also wish to incorporate in this dissent all that is so well stated by Judge Wisdom in his dissent from the denial of rehearing en banc.
 
 
 4
 Before JOHN R. BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM and RONEY, Circuit Judges.
 
 
 5
 JOHN R. BROWN, Chief Judge, with whom GODBOLD, Circuit Judge, joins, dissenting:
 
 
 6
 The factors outlined by Judge Tuttle's dissent and those in parts A, D and E of Judge Wisdom's dissent convince me that this case should be reheard en banc. I dissent to the Court's failure to grant it.
 
 
 7
 WISDOM, Circuit Judge, with whom GOLDBERG and SIMPSON, Circuit Judges join, dissenting from the denial of rehearing en banc:
 
 
 8
 With deep distress and profound regret I note the refusal of a majority of the members of this Court to give en banc consideration to this case. The absence of en banc consideration of the constitutionality of the solitary confinement procedures of the Texas Department of Corrections compounds the unfortunate result reached by the panel majority. Judge Tuttle's dissent from the panel decision effectively criticizes the result and the reasoning of the panel majority and affirmatively establishes a foundation, on the facts and on the law, for a contrary result. Notwithstanding my repetition of some of Judge Tuttle's views, I feel compelled to add my reflections on the case, so that the Court's action will not be taken as a routine rejection of a petition for rehearing en banc.
 
 
 9
 A. Rule 35 of the Federal Rules of Appellate Procedure provides in pertinent part:
 
 
 10
 A majority of the circuit judges who are in regular active service may order that an appeal or other proceeding be heard or reheard by the court of appeals in banc. Such a hearing or rehearing is not favored and ordinarily will not be ordered except . . . when the proceeding involves a question of exceptional importance. (Emphasis supplied.)
 
 
 11
 "[I]n view of recent tragic incidents in this Nation's prisons and of the frequent assertions of the inadequacy of our penal systems", factors conspicuously recognized by the panel majority, it would seem that the "exceptional importance" of this case cannot be denied. Moreover, on a carefully tried and meticulously detailed record this case raises the exceptionally important issue of the constitutionality of the Texas form of solitary prison confinement in a broad context-the prison system of one of the most populous states and the largest state within the continental limits of the United States. Many concerned citizens in this country must feel that this Court has refused to live up fully to the constitutional "curative function" of appellate review. En banc appellate review is properly confined, because of the workload of overburdened Courts of Appeals, to a few select cases raising issues of "exceptional importance". This is such a case.
 
 
 12
 B. I would reach a result contrary to that of the panel majority. There are, of course, situations where recalcitrant prisoners must be removed from the general prison population and isolated, but the Texas Department of Corrections has developed a constitutionally impermissible means for operating its system of solitary confinement. The facts which lead to a conclusion that cruel and unusual punishment exists in the Texas system of isolation are not in dispute. Prisoners in solitary confinement live in barren, lightless cells, "feed", to use the term loosely, on two slices of bread and water each day,[1] and are clothed only in a cloth gown and shielded by a blanket. The conditions of solitary confinement, whether described by the panel majority or described by Judge Tuttle in dissent, constitute cruel and unusual punishment under any of the many definitions of the practices prohibited by the Eighth Amendment.
 
 
 13
 "What constitute a cruel and unusual punishment has not been exactly decided." Weems v. United States, 1910, 217 U.S. 349, 368, 30 S.Ct. 544, 54 L.Ed. 793. This statement is as true today as it was in 1910. It is possible, however, to identify three general approaches to the definition of "cruel and unusual punishment". See Jordan v. Fitzharris, N.D. Cal.1966, 257 F.Supp. 674, 679. (1) A punishment may be "cruel and unusual" if it is "of such character . . . as to shock general conscience or to be intolerable to fundamental fairness", Lee v. Tahash, 8 Cir. 1965, 352 F.2d 970, 972, in light "evolving standards of decency". Trop v. Dulles, 1958, 356 U.S. 86, 100-101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630. See Weems v. United States, supra; State ex rel. Francis v. Resweber, 1947, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422; Rudolph v. Alabama, 1963, 375 U.S. 889, 84 S.Ct. 155, 11 L.Ed.2d 119 (Goldberg, J., dissenting); Jackson v. Bishop, 8 Cir. 1968, 404 F.2d 571. (2) A punishment may be "cruel and unusual" if it is greatly disproportionate to the offense for which it is imposed. See Weems v. United States, supra; Robinson v. California, 1962, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (Douglas, J., concurring); Rudolph v. Alabama, supra (Goldberg, J., dissenting); Jackson v. Bishop, supra. (3) A punishment may be "cruel and unusual" when it goes beyond the purpose for which it is used; that is, when it overreaches its aim. See Weems v. United States, supra; Robinson v. California, supra, (Douglas, J., concurring); Rudolph v. Alabama, supra (Goldberg, J., dissenting).
 
 
 14
 As Judge Tuttle demonstrates, the Texas system of solitary confinement is cruel and unusual because of its conditions, a lack of procedural safeguards and severe limits on its use, and "over-kill". I do not understand how the majority can find refuge in the fact that prisoners in solitary are provided with basic elements of personal hygiene, and I am quite certain that this distinction brings little consolation to prisoners in solitary. To read the earlier cases in this area as drawing a line of demarcation based on the presence or absence of soap and toilet paper is to misread these cases and to misconceive the thrust of the Eighth Amendment. Nor do I find help in the disciplinary regulations promulgated by the Texas Department of Corrections, for both on their face and as applied, these regulations merely reinforce my views as to the unconstitutionality of the solitary confinement procedure. Finally, the panel majority relies heavily on statistics to establish, as they interpret the statistics, the infrequent use of solitary, the limited duration of its use, and the scarcity of repetition of its use. These figures are irrelevant: when there is alleged cruel and unusual punishment as part of a system of penal corrections, a "de minimus" defense based on statistics is a contradiction in terms. Assuming, however, that the figures are relevant, I read them, not as justifying the Texas solitary confinement procedure but, as providing substantial support for the plaintiffs' contention of pervasive, lengthy, and repeated use of a form of confinement I would classify as cruel and unusual punishment.
 
 
 15
 C. The Court declares, "most of the conditions challenged by appellants have withstood scrutiny by other courts." The majority exhibits a reluctance to move beyond the limits which they read into prior cases. But I do not perceive those limits. The conditions at issue in the present case are far worse than those approved in the majority of the prior cases which have denied relief. At the same time, numerous decisions have granted relief to prisoners from conditions far less onerous than those complained of in the instant case. Indeed, the opinion of the panel majority runs counter to the recent trend of court decisions recognizing the right of prisoners to seek judicial review of their conditions of confinement and providing relief from unconscionable methods of incarceration. In addition to those cases discussed by the panel, here are a few of the more noteworthy cases from a long list of recent decisions: Martinez v. Mancusi, 2 Cir. 1971, 443 F.2d 921; Nolan v. Scafati, 1 Cir. 1970, 430 F.2d 548; Pierce v. LaVallee, 2 Cir. 1961, 293 F.2d 233; Landman v. Royster, E.D.Va.1971, 333 F.Supp. 621; Davis v. Lindsay, S.D.N.Y.1970, 321 F.Supp. 1134; Clutchette v. Procunier, N.D.Cal. 1971, 328 F.Supp. 767; Carothers v. Follette, S.D.N.Y.1970, 314 F.Supp. 1014; Meola v. Fitzpatrick, D.Mass. 1971, 332 F.Supp. 878; Smoake v. Fritz, S.D.N.Y.1970, 320 F.Supp. 609; Fortune Society v. McGinnes, S.D.N.Y.1970, 319 F.Supp. 901; Payne v. Whitmore, N.D. Cal.1971, 325 F.Supp. 1191; U. S. ex rel. Wolfersdorf v. Johnston, S.D.N.Y.1970, 317 F.Supp. 66; Blyden v. Hogan, S.D.N.Y.1970, 320 F.Supp. 513; Fulwood v. Clemmer, D.D.C.1962, 206 F.Supp. 370; Sostre v. Rockefeller, S.D.N.Y.1970, 312 F.Supp. 863; Sostre v. Otis, S.D.N.Y.1971, 330 F.Supp. 941; Knuckles v. Prasse, E.D.Pa.1969, 302 F.Supp. 1036. See also Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652, 1972.[2]
 
 
 16
 Assuming, however, that the method of confinement in the instant case is not covered by previous decisions and may not be declared cruel and unusual on the basis of those decisions, I totally reject the reluctance of the panel majority to go beyond the supposed limits of prior decisions in order to declare the Texas system of solitary confinement cruel and unusual. The Supreme Court has said:
 
 
 17
 The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. . . . The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society. (Emphasis supplied.)
 
 
 18
 Trop v. Dulles, 1958, 356 U.S. 86, 100-101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630. In an area where court decisions must necessarily be predicated upon "evolving standards" and "the progress of a maturing society", it is self-defeating to be bound by one's apprehensions of the limits of prior cases. Else, how did we develop from the days of pillorying, disemboweling, decapitation, and drawing and quartering, and how are we to continue to protect "the dignity of man"?
 
 
 19
 D. I share the reluctance of the panel majority to interfere with matters of internal prison administration and discipline. This attitude has in fact been repeatedly expressed by this Court in a variety of factual contexts. See Krist v. Smith, 5 Cir. 1971, 439 F.2d 146; Haggerty v. Wainwright, 5 Cir. 1970, 427 F.2d 1137; Conklin v. Wainwright, 5 Cir. 1970, 424 F.2d 516; Roy v. Wainwright, 5 Cir. 1969, 418 F.2d 231; Granville v. Hunt, 5 Cir. 1969, 411 F.2d 9. To say, however, that it is our duty to refrain from undermining the authority of prison officials by refusing to interfere with internal prison matters begs the question. For, it is equally our duty, repeatedly reaffirmed by the United States Supreme Court and this Court, to review the acts of prison officials in order to correct abuse of discretion constituting cruel and unusual punishment.
 
 
 20
 In a case such as the instant case, I would require the prison officials to submit some justification, in terms of deterrence, maintenance of order, rehabilitation, or other correctional goals, for the means employed here. Given the undisputed conditions-"the lightless cell, the limited bedding, and the minimal food"-, it is reasonable to require prison officials to submit at least some justification so that the Court may intelligently assess their exercise of discretion. It is not the concept of solitary confinement which is at issue here but the conditions of Texas solitary confinement. This record is totally barren of any justification for this form of solitary confinement. To require some justification is not to enter and attempt to resolve the debate "over the harmful vis-a-vis the helpful effects of solitary confinement"; it is to insure that judicial review does not operate in a vacuum but is based on a thorough assessment and weighing of competing values.
 
 
 21
 E. A court may not have the expertise to determine the effects of solitary confinement on prison inmates. But we should not consider this case en banc solely because of the effects the conditions of confinement may have on these plaintiffs and those they represent. We should examine this form of solitary confinement because, to use Judge Tuttle's words, "how we treat these particular individuals determines, to a large extent, the moral fibre of our society as a whole and if we trespass beyond the bounds of decency, such excesses become an affront to the sensibility of each of us."
 
 
 22
 Full consideration of the issues raised by this case is not only important because of the effect of the Texas form of solitary confinement on the prisoners; nor is it important solely because of the way this form of prison confinement reflects the moral fibre of our society. The issues raised by this case are important in a very real sense, to each member of our society because of a condition all too familiar to our society-recidivism. While estimates of recidivism vary widely, it has been suggested that as many as two of three released inmates will subsequently be convicted for another crime.[3] In view of the admitted existence of a vigorous debate over the relationship between methods of prison confinement and recidivism, we must be extremely vigilant in the performance of our judicial role. Our duty is to decide whether the Texas system of solitary confinement, as it operates in fact, is violative of the Eighth Amendment. That duty is made increasingly important by the rising rate of recidivism.
 
 
 23
 I disagree with the result reached by the panel majority. I reject the means the court used to reach that result. I am distressed by the refusal of a majority of the members of this Court to give this case the en banc consideration it deserves.
 
 
 24
 COLEMAN, Circuit Judge, with whom INGRAHAM, Circuit Judge joins, concurring in the denial of rehearing en banc:
 
 
 25
 Without the slightest qualm or misgiving I voted to deny rehearing en banc in this case. Since some of by Brethren have exercised the right, which is clearly theirs, of elaborating upon their reasons for voting in favor of en banc consideration I exercise the same right to briefly state my position.
 
 
 26
 The gross national product of this Country has increased in dollar value about fourteen fold in the past fifty years. The national income has increased to about the same extent. Advances in educational opportunity and almost every activity of life have kept pace with this startling economic expansion.
 
 
 27
 Unfortunately, this economic development has not been without its unpleasant companions. The United States had 139,000 armed robberies in 1970 alone. In the nine years between 1961 and 1970 nearly 700 policemen were slain. The statistics on all forms of criminal activity have, I regret, ballooned at an incredible rate. I do not think that it is an exaggeration to say that there is hardly a would-be criminal alive in this Country today who does not believe that he can escape either detection or conviction. If, however, he should fail in those respects then he believes that he can get his conviction reversed, or set aside on collateral attack. What appears to be an unstoppable glacier has been paralyzing the ability of the states to obtain final convictions in criminal cases. Similar efforts have been hurled against keeping the prisoner in jail after conviction or controlling him if he is kept. Similar attacks upon the power of the federal government are commonplace. Fortunately, they meet with less success, probably because the state courts cannot review the actions of the federal courts but the federal courts, upon any far fetched federal constitutional claim, spend a large portion of their time reviewing the judgments of state courts and the actions of state institutions, particularly including the prison systems.
 
 
 28
 The emphasis seems now to be that if a final conviction cannot on any imaginable premise be avoided then the warden of the prison SHALL be rendered impotent to operate the prison or to control the behavior of the prisoners. Recent prison riots in the United States in which prisoners presumed to "negotiate" the control and operation of the prison should be a fire bell in the night to those who believe that there must be enforceable rules for the protection of all persons in a heavily populated society.
 
 
 29
 In their most rude and primitive state men found out, thousands of years ago, that there must be laws to govern the conduct of men-some form of law goes as far back as history can take us. Much of the efforts of mankind have been devoted toward the development of law with a view to preserving the freedom and safety of individual members of society with as little interference as possible in the liberties of others.
 
 
 30
 In the old days punishment was swift, certain, and often exceedingly cruel. The citizen was at the mercy of the sovereign. In comparatively modern times the King could have his prosecutor but the defendant was not allowed counsel. The defendant could not so much as offer his own testimony from the witness stand. Our forefathers, in the beginning of the Republic, sought to prevent a repetition of this state of affairs by insisting on the Amendments which were quickly appended to the Constitution of the United States. This was well and good, and should be now, but I am strongly opposed to the perversion of these great principles into engines on behalf of murderers, robbers, rapists, and other criminals. These wise safeguards were never intended to give the murderer or the robber or the rapist immunity from the consequences of his crime. They were not designed for the purpose of requiring the law abiding citizen to stand unprotected in the face of one who deliberately chooses to violate the law and seeks to excuse it on some personal reason of which he claims the right to be the sole judge. In my opinion, the Amendments were never intended for use as weapons for the destruction of the penal processes by which it was once hoped that criminals could be taught that crime does not pay.
 
 
 31
 Novak, the appellant in this case, not only cut his tendons in an effort to thwart the control of the penitentiary authorities but his recalcitrance was so extreme that during various intervals in the year 1968 he spent a total of three and one half months in solitary confinement in the Texas prison system. I am unable to glean from the record any serious contention that Novak did not understand the nature of what he was doing or the consequences of his utter unwillingness to comply with prison regulations. Not much seems to be said about the undeniable fact that all any prisoner has to do to stay out of solitary is to obey the prison regulations. There are plenty of remedies besides disobedience if the rules violate constitutional standards. I shed no tears for Novak because, in my considered judicial opinion, he deserves none.
 
 
 32
 I was greatly interested to read the testimony in the appellate record from "sociologists" and "penologists" who feel that the only way to handle an unruly prisoner is to "find out what is making him act that way" and then remove the cause. As one who has had considerable experience in this field, in many different aspects of it, and as one who does not need a theory to assist in the recognition of an undeniable fact, I take my judicial stand in opposition to those who would place our prison authorities at the mercy of the prisoners and who would, in effect, liberate the prisoners while they are yet in prison. Such a course is not only not required by the Constitution of the United States but will ultimately destroy this Country and the Constitution along with it.
 
 
 33
 Like any reasonable human being I dislike unnecessary harshness. I stand appalled in the face of cruelty. I condemn them. I do say that those in charge of a prison must manage it and operate it. It is a fact that only a small percentage of prisoners are so hardened, so incorrigible, so determined to establish their own immunity to prison rules and regulations that they insist on going to solitary to prove their point. It is regrettable that such conflicts arise but when they do arise there is no question as to who must prevail.
 
 
 34
 For the last fifteen years there has been a great race to see who could go the farthest and the quickest in the protection of the rights of those who are accused of crime. Much of the result, but not all of it, has been good. The time has come, I think, for a reexamination of the scales and an improvement of the outlook to the end that he who chooses to live an orderly, law abiding life shall not be at the mercy of those who choose not to do so.
 
 
 
 [1]
 Although the regulations require that a prisoner in solitary receive a full meal every 72 hours, there was testimony that the regulations are not followed
 
 
 [2]
 See Note, The Cruel and Unusual Punishment Clause and the Substantive Criminal Law, 79 Harv.L.Rev. 635 (1966); The American Correctional Assoc., Manual of Correctional Standards (3rd ed. 1966); Note, The Problems of Modern Penology: Prison Life and Prisoners' Rights, 53 Iowa L.Rev. 671 (1967); Hirschkop & Milleman, The Unconstitutionality of Prison Life, 55 Va.L.Rev. 795 (1969); Comment, The Role of the Eighth Amendment in Prison Reform, 38 U.Chi. L.Rev. 647 (1971); Note, Decency and Fairness: An Emerging Judicial Role in Prison Reform, 57 Va.L.Rev. 841; Note, Courts, Corrections, and the Eighth Amendment: Encouraging Prison Reform by Releasing Inmates, 44 S.Cal.Rev. 1060; Milleman, Prison Disciplinary Hearings and Procedural Due Process-The Requirement of a Full Administrative Hearing, 31 Md.L.Rev. 27 (1971); Prisoners' Rights and the Correctional Scheme: The Legal Controversy and Problems of Implementation-A Symposium, 16 Vill.L.Rev. 1029; Jacob, Prison Discipline and Inmates Rights, 5 Harv.Civ.R.Civ.L.L.Rev. 227 (1970); Note, Prisoners' Rights Under Section 1983, 57 Geo.L.J. 1270 (1969)
 
 
 [3]
 See Note, Turn 'em Loose: Toward a Flexible Corrections System, 42 S.Cal.L.Rev. 683 (1969); R. Clark, Crime in America 215 (1970); Robinson & Smith, Effectiveness of Correctional Programs, 17 Crime & Delin. 67 (1971); Sturz, Diverting the Recidivist, 5 Trial 21 (1969); Habitual Criminal: A Symposium, 13 McGill L.J. 533 (1967); Metzner & Weil, Predicting Recidivism: Base Rates for Mass. Correctional Institutions at Concord, 54 J.Crim.L.C. & P.S. 307 (1963)