782 F.2d 896
 Carl J. ISAACS and George Elder Dungee, Petitioners-Appellants,
v.
Ralph KEMP, Warden, Georgia State Prison, Respondent-Appellee.
Carl J. ISAACS, Petitioner-Appellant,
v.
Ralph KEMP, Warden, Georgia State Prison, Respondent-Appellee.
Wayne Carl COLEMAN, Petitioner-Appellant,
v.
Ralph KEMP, Warden, Georgia Diagnostic and Classification
Center, Respondent-Appellee.
George Elder DUNGEE, Petitioner-Appellant,
v.
Ralph KEMP, Warden, Georgia State Prison, Respondent-Appellee.
 Nos. 82-8017, 85-8277, 82-8310 and 85-8202.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 31, 1986.
 
 Appeals from the United States District Court for the Middle District of Georgia; J. Robert Elliott, Judge.ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC
 
 
 1
 (Opinions December 9, 1985, 11 Cir., 1985, 778 F.2d 1482,
 
 
 2
 778 F.2d 1487).
 
 
 3
 The Petition for Rehearing is DENIED and the Suggestion for Rehearing En Banc is also DENIED.
 
 
 4
 HILL, Circuit Judge, dissenting from denial of rehearing en banc, in which FAY, Circuit Judge, joins:
 
 
 5
 The court has ordered that these cases not be reheard en banc. From that order, I respectfully dissent.[1]
 
 
 6
 I do not presume to dissent from the panel's judgments ordering that the writs be granted in these cases. Had we proceeded, en banc, to the further analysis I suggest below, the judgments might well have been the same. I would make no judgment on the merits absent counselling which should be offered to the full court. In my view, however, the full court could and should take the opportunity that these cases provide to clarify an area of constitutional law that is presently murky.
 
 
 7
 I have little doubt that the state court should have ordered a change of venue in these cases. The administration of justice must be even-handed and should be so perceived. Were we considering these cases on direct appeal from convictions in a federal court, I have little or no doubt that, in the exercise of our supervisory power, they should be reversed. In these habeas cases, however, we are required to determine whether state court proceedings were constitutional--nothing more.[2]
 
 
 8
 It is clear to me that the panel undertook to exercise just this limited function. The panel obviously labored long and hard in the review of a massive record. The thorough re-creation of the publicity preceding the trials is a tribute to the court and to counsel. The judgment granting the writs rests upon the particular facts of these particular cases. We should, I submit, provide an analysis which would be helpful in future cases. Publicity--and the community feelings thereby expressed and engendered--should be more thoroughly analyzed for its constitutional significance than has been done in these cases or was done in Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), the leading authority thus far in the field.
 
 
 9
 The media plays an important role in our free society. I doubt that it would be contended that a well-informed forum is one that cannot conduct a constitutional criminal trial. When, if ever, does the accurate reporting of fact offend the administration of justice? I suppose that responsible media organizations and people would like to know. Clearly, judicial officers dedicated to the provision of fair trials would like to know. These issues are presented in these cases, and I regret our decision not to undertake a more helpful analysis.
 
 
 10
 The intensive review detailed in the panel opinion reveals several distinct categories of public reporting of what I take to be essentially accurate facts. Their accuracy, at least, is not questioned. I touch on a few of those categories. I suggest that we could and should analyze them separately.
 
 The Crime
 
 11
 Initially, the media reported how the law had been broken. Six members of the community had been systematically murdered. One had, before her execution, been repeatedly raped. Much of what was said then and thereafter concerned the details of the criminal acts which had taken place. The crimes were horrible, and those who read about them or heard about them and reported upon them were outraged.
 
 
 12
 I submit that it is meet and proper that our society and its members be outraged at the commission of crimes such as were committed by the petitioners in these cases. A community ought not be constitutionally disqualified as a forum for the administration of criminal justice because its people are conscious of crimes committed in the community and outraged by them. It does not offend the Constitution for public awareness of the consequences of crime to be heightened by reports of crimes--whether multiple murders, distribution of controlled substances, or driving while under the influence of drugs or alcohol. We ought never leave the impression that the Constitution demands a forum where the people are not biased or prejudiced against criminal conduct. A juror need not feel "neutral" about whether or not people should rob banks in order to sit in judgment on one accused of bank robbery.
 
 
 13
 These cases could never be tried before a jury unaware of the horror of the offenses for which the petitioners were on trial. The facts of the crime will inevitably be made known to the jurors at any trial, anywhere. Moreover, I find nothing improper in concern, even anger, on the part of potential jurors about crimes such as those at issue in this case. The publicity reporting the murders of the members of the Alday family and the strong feelings of outrage in the community over those crimes should be treated differently than other types of publicity that might more plausibly have affected the outcomes of the trials. I believe this category of publicity should be given little, if any, weight in determining whether a criminal defendant has received a fair trial.[3] I acknowledge that our panel apparently considered this category only to the extent that it found it to be evidence of prejudgment, contributing to a conclusion that the community was so inflamed that a fair trial could not be had. That may be proper. Yet, inasmuch as no jurors can serve in these cases, anywhere, without being immediately exposed to knowledge of the crimes, I feel that the full court should have reheard and, upon rehearing, determined whether or not any weight should be given to this community bias against crime.The Accused
 
 
 14
 While bias and prejudice against crime does not, in my view, disqualify a community from administering justice in a case in which the state has accused an individual of committing a crime, bias or prejudice against the accused stands on a different footing. We should have, therefore, examined publicity about the accused--the petitioners here--as a separate category of publicity. Further, I would identify and distinguish within that category two subcategories of publicity--(1) information that later is made known to the jury at trial, and (2) information that is not.
 
 
 15
 (1)
 
 
 16
 It appears that, in the discharge of their responsibility, the media reported diligently upon the work of law enforcement officials investigating the crimes, including the apprehension of those suspected of committing them. Evidence leading to the arrests and indictment of these individuals was made public as it came to light. In this area, a tension often develops between free press and fair trial concerns. It might better serve our desire to ensure the clinical sterility that we feel is most likely to result in a fair trial to allow no pre-trial reporting of the results of ongoing criminal investigations. Were that so, however, the people would suffer a lack of valuable information about whether public officials were discharging their responsibilities in a satisfactory manner. We tend in this nation to trust and believe in the value of an informed citizenry. In this case, the tension between free press and fair trial values was great, because the information obtained by law enforcement officials strongly supported the thesis that those arrested were in fact guilty.[4]
 
 
 17
 We should have analyzed and evaluated the significance of this kind of publicity as a subcategory of publicity that is distinct in important respects from the category first discussed above. I apprehend that we should have done so with this fact in mind: Most of that which was reported, second hand, by the media was later properly reported, in detail, by those with first hand knowledge of the facts, as testimony before the juries that heard the cases;[5] inevitably, it will be so reported to any jury, anywhere, if the cases are re-tried. It is entirely proper for the jury to be made aware of this kind of information. It is its wide dissemination in advance of trial that is perceived to be the problem. Such publicity may be likened to a premature opening statement made by a prosecutor who says what the state will prove, but which is not proved save by evidence properly admitted at trial. Such pre-trial publicity should be appraised as a separate category from that which does not bear on the guilt or innocence of the defendants. Only after carefully examining each such item of publicity, aided by counsel, should we determine the weight it should be accorded in deciding whether a fair trial has been denied, perhaps placing heavy emphasis on whether the admitted information was disputed at trial. Here, again, the panel considered publicity in this category to the extent that it felt that the publicity demonstrated community prejudgment. The full court, by applying the analysis I suggest, could have attributed appropriate weight to it for future reference.
 
 
 18
 (2)
 
 
 19
 We should have taken particular note of that distinct subcategory of potentially prejudicial publicity concerning one or more of the defendants that was not admitted as evidence at trial. One defendant was said to have confessed to an earlier murder that occurred in Pennsylvania or Maryland. Unlawful earlier activities of the defendants said to have constituted a "crime spree" were reported. Although evidence of these events might properly have been introduced to show a motive for murdering the Aldays, who might otherwise have aided in the earlier apprehension of petitioners, or might have been introduced for some other reason at the sentencing hearing, it appears that they were not. Fair trial-free press tensions are most apparent in this area. When the law demands that certain facts--because they are not material and might prejudice the defendant, or because they have been suppressed to vindicate important constitutional rights--be kept from jurors to insure a fair trial, yet they are widely reported in media that is read, heard and watched by potential jurors, a problem exists. The problem is not addressed by restraining the media; it is sometimes addressed by change of venue. Usually it is appropriately handled by proper instructions of the court to the jury, confining the jurors to the evidence admitted at trial. We should afford this subcategory of publicity the greatest weight in determining whether individuals such as the petitioners in this case have been denied a fair trial.
 
 Precautions
 
 20
 Neither the media nor the state court was unaware of fair trial concerns. As the panel observed, at least one widely read newspaper reminded its readers in a front page editorial of the importance of ensuring that the defendants received a fair trial.[6] The panel also notes that the trial in Coleman, and presumably in the other cases, was conducted "with decorum and dignity." 778 F.2d at 1540 n. 23. The trial court judge put squarely to the venirepersons the question whether they could sit on the jury without bias or prejudice against the accused, and only those who, under oath, responded that they could do so were found qualified to serve.[7] As the panel recognized, this kind of voir dire is a time-honored and valued ingredient in our jury system; it ought not often be found insufficient. The full court should have given these precautions by the press and the trial court appropriate weight in the overall analysis.
 
 Conclusion
 
 21
 In short, I feel strongly that the full court should have reheard those cases. The authority for the "presumed prejudice" analysis that was applied in this case is the Supreme Court's decision in Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). We have failed to take advantage of the opportunity provided by these cases to articulate a set of guiding principles to engraft upon the rather bare bones of that case. While the first amendment gives much license to the media, I apprehend that responsible men and women in that profession would be pleased to know our views in order that free press-fair trial tensions, although perhaps inevitable, might be lessened. Judges dealing with cases which attract media attention ought to have the benefit of an analysis they might adopt.
 
 
 22
 Had we reheard the cases, I would reach any final conclusions about this case only after counselling in the form of en banc briefs and argument. Presently, I apprehend that I would find nothing to criticize in reports of public outrage about the crime; little to criticize in factual reports of the investigation; much to concern me in widespread reports of information that is detrimental to any defendant and is not admissable at trial or sentencing; much to commend in public reminders of the importance of ensuring a fair trial; and much to credit in the voir dire responses of the jurors under oath. Nevertheless, as stated before, I am certainly not prepared to say that I would ultimately conclude that writs of habeas corpus ought not be granted in these cases.
 
 
 23
 The panel has, sincerely and with commitment to the Constitution, done much. The full court should have finished the job they have begun.
 
 
 
 [1]
 Dissents from orders denying rehearing en banc have proliferated in our court, see, e.g., Bowen v. Kemp, 778 F.2d 623 (11th Cir.1985); Stephens v. Kemp, 722 F.2d 627, 628, 629 (11th Cir.1983); Jaffree v. Wallace, 713 F.2d 614, 615 (11th Cir.1983); United States v. Hastings, 704 F.2d 559, 560 (11th Cir.1983); Woodson v. Schweiker, 671 F.2d 118 (5th Cir.1982); Debra P. v. Turlington, 654 F.2d 1079, 1080, 1086 (5th Cir.1981); Gates v. Collier, 641 F.2d 403 (5th Cir.1981); Dearborn Marine Service, Inc. v. Chambers & Kennedy, 512 F.2d 1061, 1062 (5th Cir.1975); United States v. Miller, 508 F.2d 588, 589 (5th Cir.1975); Allen v. City of Mobile, 466 F.2d 122, 131 (5th Cir.1972); Novak v. Beto, 456 F.2d 1303, 1304 (5th Cir.1972), and in other courts of appeals, see, e.g., Prejean v. Maggio, 765 F.2d 482, 487 (5th Cir.1985); Dronenburg v. Zech, 746 F.2d 1579, 1581 (D.C.Cir.1984); Williams v. Nix, 700 F.2d 1164, 1175 (8th Cir.1983); Boraas v. Village of Belle Terre, 476 F.2d 806, 824 (2d Cir.1973); Lee Fook Chuey v. Immigration & Naturalization Service, 439 F.2d 244, 251 (9th Cir.1971), to the point where the practice may be said to have become institutionalized. Its growth appears to have coincided with the increase in the number of published dissents from orders denying certiorari in the Supreme Court. Not all judicial officers have found the latter appropriate. See Singleton v. Commissioner of Internal Revenue, 439 U.S. 940, 942, 99 S.Ct. 335, 337, 58 L.Ed.2d 335 (1978) (opinion of Stevens, J., respecting the denial of the petition for writ of certiorari). When the court has been polled on a petition for rehearing en banc, and a majority votes against, it may be appropriate that a simple order reciting that fact be the end of the issue. The proposition has sufficient merit that, were the practice of dissenting from such orders not now commonly accepted, I have no doubt that I would not initiate it
 
 
 [2]
 I think it important to note here a truism that is easily forgotten--that the Constitution only demands of a criminal trial that constitutional rights, including the right to due process of law, be respected. The right to a fair trial is only a right to due process of law, and does not include a right to advantages at trial that might aid a particular criminal defendant a great deal simply because of the overwhelming evidence against him. Thus a trial may appear very one-sided but yet be a fair trial, and not offend the Constitution, as long as the defendant is afforded the basic protections of due process of law
 
 
 [3]
 Strictly speaking, one can easily imagine a case in which publicity reporting certain facts of an incident that are entirely unrelated to a particular defendant might aid the prosecutor and prejudice the defendant on trial, by convincing the community from which the jury is drawn that a crime in fact occurred when the corpus delicti is in doubt. In the cases here under investigation, however, there can be no question that the prosecutor could not have been materially aided in proving the corpus delicti by the widespread publicity reporting the facts of these murders
 
 
 [4]
 The panel opinion in Coleman acknowledged that "there was, in fact, overwhelming evidence of the petitioner's guilt adduced at trial." Coleman v. Kemp, 778 F.2d 1487, 1541 (11th Cir.1985). This included principally the testimony of Billy Isaacs and fingerprint evidence that placed the petitioners at the scene of the crimes
 
 
 [5]
 It is not contended that these reports were not even-handed. That is, the media did not report information tending to show guilt and suppress that tending to exonerate the defendants. There was simply none of the latter to report, and the defendants offered none at trial
 
 
 [6]
 The editorial read in part as follows:
 There is a wide difference in the question of whether the people here could give the suspects a fair trial, and in our wanting to see the guilty ones punished and removed from being able to commit the same outrages again, a few years from now, on other innocent people.
 But our people want to be sure that the suspects now being held in jail are the ones who committed the crimes. We don't want to see four innocent men punished, if they should turn out to be innocent of the charges against them, and the other charges to come.
 The editorial criticizes the "few screwballs among us who get a thrill out of talking dumb and sounding off about what all they'd like to do to the four men." It also notes that the surviving Aldays wished for justice to run its due course. The editorial concludes as follows:
 And there's no room for error here. The only thing any kind of mob action, or inciting troublesome thoughts can bring is more sorrow.
 Think about this often, as the long, drawn-out trial days go slowly along. It's a hard fact of life, and there's no profit in forgetting it. The law must be obeyed.
 As the panel opinion notes, "[t]he district court viewed [this] front-page editorial in the May 24 Donalsonville News as typical of the publicity surrounding the crime." Coleman v. Kemp, at 1492.
 
 
 [7]
 It is suggested in the panel opinion in Coleman that the question there was not adequately put. Coleman v. Kemp, at 1541-43. Many potential jurors, however, candidly acknowledged their disqualification for bias. They apparently understood what they were being asked