**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Jorge ARROYO, a/k/a Sergio,
Defendant-Appellee.**

No. 85-2605.

United States Court of Appeals,
Fifth Circuit.

Dec. 12, 1986.

Gloria C. Phares, Washington, D.C., Henry K. Oncken, U.S. Atty., Susan L. Yarbrough, James R. Gough, Asst. U.S. Atty., Houston, Tex., for plaintiff-appellant.

Don Lambright, Kent A. Schaffer, Houston, Tex., for defendant-appellee.

Before GOLDBERG, REAVLEY and GARWOOD, Circuit Judges.

GOLDBERG, Circuit Judge:

Following a jury trial, Defendant Jorge Arroyo was convicted on one count of conspiring to import and distribute cocaine, two counts of possessing cocaine with intent to distribute, one count of importing cocaine, and one count of attempting to import cocaine. Arroyo was acquitted on two counts of importing cocaine, one count of distributing cocaine, and one count of possessing cocaine with intent to distribute.

During the trial, Judge Carl Bue erroneously admitted hearsay statements of an alleged co-conspirator that were not made in furtherance of the conspiracy, in violation of the rule established in *United States v. James*, 590 F.2d 575 (5th Cir.1979) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). After considering a mistrial motion, Judge Bue found that the admission was erroneous, but determined that he could cure the error by an appropriate instruction to the jury. After the jury verdict, the defense again pressed the *James* claim, and Judge Bue granted Arroyo a new trial.

We originally vacated the grant of new trial because we believed that the motion was not timely filed, and thus that Judge Bue lacked jurisdiction to consider it. 791 F.2d 1243 (5th Cir.1986). We rescinded this vacation on petition for rehearing, because Arroyo timely had filed his motion. 794 F.2d 208 (5th Cir.1986). The Government now appeals the new trial grant because Judge Bue allegedly failed to apply or misapplied harmless error analysis. We affirm Judge Bue's decision.

## I. Factual Background

The record in this case consists largely of conflicting statements and gaps of critical information. Defendant Arroyo conducted almost all of his alleged activities in the presence of confidential government informants Dan De La Garza and Harvey Davis. Because De La Garza's statements consti-tuted impermissible hearsay, because Defendant Arroyo did not testify, and because the other parties to the relevant importation or distribution transactions are fugitives or otherwise missing, the substantial bulk of incriminating evidence derives solely from the testimony of Drug Enforcement Agency (DEA) Agent Roger Norman and of Davis, and from a tape recording of a conversation between Davis and Arroyo. This evidence is in repeated conflict.

Harvey Davis, the Government's key witness, drug addict, and double-dealing informant, the only person who might have explained what had happened or interpreted the taped admissions of Arroyo, repeatedly contradicted himself on cross-examination. Documentary evidence further casts doubt on Davis' testimony, showing, *inter alia*, that Davis could not have been where he claimed on at least two occasions. DEA records contradict Agent Norman's testimony; his memory is noticeably unreliable, short, or convenient. Some records of the DEA reveal internal conflicts, or have been tampered with; DEA agents have been unable to explain these discrepancies. Agent Norman ordered that video- and audio-tapes of some of the alleged transactions be destroyed. We thus describe the factual background with the following, important caveat: we cannot be certain that many of these "facts" are correctly described, or have occurred at all. However surreal the portrait that we paint may appear, we are required for the purposes of harmless error analysis to provide a description of the context and of the evidence adduced at trial.

Defendant Jorge Arroyo, a.k.a. Sergio, came to the United States from Bolivia as a student four years ago. After two semesters of studying English, he entered the business of wholesaling empanadas (meat pies) to support his wife and child. His father-in-law, Hugo Banzer, was at the time of trial and previously had been the President of Bolivia; Banzer apparently helped Arroyo to pay his rent and monthly expenses. Arroyo's two sisters, also in the

United States to study, helped with the empanada business at various times.

Arroyo discovered trouble quickly. In 1982, he was convicted in state court of possessing less than one-half gram of cocaine, and was placed on probation, conditioned on his submitting to random urine testing. He does not appear to have violated this condition, and worked from that time until his arrest in this case. His empanada business failed, and he has filed for bankruptcy.

According to Harvey Davis, Davis (and likely Dan De La Garza as well) met Arroyo sometime in March or April of 1984, through Guillermo Nino and Jackie Higgins. Davis testified that Nino and Higgins introduced Arroyo to assist De La Garza and Davis in developing a cocaine connection in South America. Nino and Higgins may have been involved in drug activity, and Davis claims they may have been murdered and robbed by DEA agents, in particular by Agent Norman. Nino and Higgins did not appear at trial.

After meeting De La Garza, Arroyo may have borrowed about $2,000 from him, which Arroyo may have become unable to repay. According to Davis, De La Garza paid Arroyo a courtesy call, "busted into Mr. Arroyo's and kicked the door down," and threatened Arroyo for his failure to repay the money. Appeal Record, Vol. 9, at 79. To repay the debt, Arroyo allegedly gave De La Garza the name of Arroyo's uncle in Bolivia, Nelson Pina, as a man from whom De La Garza could obtain cocaine. De La Garza and Davis travelled to Bolivia but were unable to obtain cocaine from Pina, whom De La Garza may have physically beaten. They returned to the United States. Davis testified that De La Garza subsequently visited Arroyo, at which time Davis was "sure he [De La Garza] probably said he would kill him [Arroyo]." Appeal Record, Vol. 9, at 93.

This apparently was not De La Garza's maiden voyage into the turbid waters of cocaine trafficking. According to Davis, De La Garza did not use cocaine; rather, De La Garza was an illicit entrepreneur, brokering cocaine exclusively for profit. DEA Agent Roger Norman testified that De La Garza was the President of a company called "International Bodyguards," which De La Garza used as a cover for his drug-brokering activity. Davis, however, testified that the company was a cover for De La Garza's informant activity, and that De La Garza would often claim that he had protected numerous, wealthy individuals. Davis also testified that De La Garza was a violent man, trained as a soldier during the Vietnam War, who usually carried a pistol and had in his possession an Uzi submachine gun. Davis characterized De La Garza as the type of person with whose requests people complied.

Davis, De La Garza's associate and friend from high school, lived in Houston, after moving from Corpus Christi following a tour of duty in Vietnam. At some time, Davis passed numerous bad checks, and was arrested on child desertion charges. Davis testified that he began to use cocaine in Houston. He testified on three different occasions that he used cocaine about 30 times, about 500 times, and about 5,000 times. He allegedly moved to Phoenix to clean up his cocaine habit, and became a car salesman.

After about a year, Davis allegedly was contacted by De La Garza to help De La Garza to distribute cocaine. In 1983, before he knew Arroyo, De La Garza apparently travelled to Bolivia, where he obtained cocaine. Davis flew from Phoenix to meet De La Garza in Matamoros, Mexico. Together, they drove the cocaine across the border into the United States. De La Garza kept or sold about 28 ounces, and Davis took ten ounces to Phoenix. After Davis asked De La Garza to send him more cocaine, Davis was arrested by the Phoenix Department of Public Safety Narcotics Squad. Davis returned to Houston around March of 1984 to "work off his beef," *i.e.*, he was permitted to work for a governmental agency in exchange for dropping his prosecution or reducing his sentence. Davis testified that De La Garza had made a deal with the Houston Police

Department to have Davis assist in a Houston drug bust. Davis and De La Garza, however, continued to purchase cocaine in multiple-ounce quantities, hoping for larger buys, from a seller named Carlos Sanchez. Sanchez did not appear at trial. Davis claims that he stopped buying from Sanchez after a month or so.

The Houston Police Department may have introduced De La Garza to the DEA, to have him work on a "contract basis." De La Garza apparently provided information regarding drug activities around Houston. According to DEA Agent Roger Norman's testimony, De La Garza became a numbered, confidential informant about this time. Agent Norman opened this case on the basis of information provided at a meeting he held with De La Garza and Davis on May 1, 1984. Davis' testimony contradicts that of Agent Norman as to when Davis became a confidential informant. DEA records signed by Agent Norman and Agent Robert Muller in 1984 indicate an informant number for Davis established in 1985. Neither Agent Norman nor Agent Muller could explain this odd entry in the official document. Similarly, testimony substantially conflicts as to the instructions given Davis regarding permissible activities while working for the DEA, and as to the nature of the remunerative arrangement under which Davis was to inform. Davis' testimony contradicts Agent Muller's testimony as to whether Davis expects to receive a reward for his testimony.

Davis testified that his initial duty was to "do whatever was necessary to get information and evidence on [Arroyo]," who had been "targeted" after the first meeting. Appeal Record, Vol. 9, at 104. Davis also claims that he was taking directions from De La Garza, not directly from Agent Norman. Agent Muller testified that it would be highly unusual for an informant to take directions from another informant, rather than directly from a DEA Agent. Davis also testified that he was later supposed to take orders from F.B.I. Agent Jan Linsley, rather than from Agent Norman, after allegedly reporting on Agent Norman's possible involvement in murder. Davis states

that he attempted to leave the DEA around October or November of 1984, but reconsidered when Agent Norman allegedly agreed to arrest suspects involved in a 1,000-kilogram buy.

Agent Norman, Davis, and De La Garza held subsequent discussions to arrange a meeting with Arroyo. That meeting occurred at a restaurant in Houston on May 8, 1984, and marks the beginning of the alleged conspiracy of which Arroyo was convicted of being a member (Count One of the indictment). Agent Norman testified that the four men discussed the possibility of a 100- or 110-kilogram buy (220,000 times the amount of cocaine involved in Arroyo's possession charge), and that Arroyo indicated that large amounts were being flown into the country and were available in California. Agent Norman refused to purchase the cocaine in California, insisted that Arroyo provide a local supply, and quibbled over the price; they failed to reach any agreement. Agent Norman testified that he had no further contact with or knowledge of Arroyo until September 12, that he asked Davis to keep him apprised of Arroyo's activities, and that Davis repeatedly tried without success to contact Arroyo. Davis claims that he was in routine contact with Arroyo during this period.

Davis also testified that he had a meeting with Arroyo on July 1 to discuss further the possibility of a drug buy. Arroyo allegedly introduced another purveyor of cocaine, Wilfredo Rivera, to Davis. Rivera apparently was importing cocaine by placing small packages filled with four kilos of cocaine in the grease under flange plates of turbo housings in turbofans (turbochargers used with jet airplane engines) sent to the United States for repairs. Davis testified at different times that these shipments were arriving once and twice a month. Another individual named Juan Verastequi picked up the turbofans that were imported on July 5, 1984. William Delafleche, an employee for a turbine repair company, testified that he inspected the turbofans for the purpose of estimating repairs, after the company was provided these turbines

by Rivera on July 10, 1984. The turbo housing and bearing housing were gutted in a manner allegedly consistent with importation of cocaine in a turbofan. The cocaine allegedly imported in the July 5 turbofans forms the basis for Count Two (importation), on which Arroyo was acquitted.

A shipment of cocaine in a turbofan was, however, discovered by Miami customs officials after inserting a screwdriver into the grease under a flange plate, and was seized by officials in Houston—who were notified from Miami—on September 12. A controlled delivery was executed on September 14, after most of the cocaine had been removed. Verastequi and Rivera picked up the turbofan. After taking the turbofan back to Rivera's warehouse, Agent Muller and a DEA team entered the warehouse to detain all persons who were inside. When the search warrant arrived, the DEA seized the turbofans but made no arrests, allegedly because the turbofan had not been opened, thereby failing to establish probable cause for possession.

Arroyo was not at Rivera's warehouse at this time, and was not one of the persons detained. According to a taped conversation [1] between Arroyo and Davis, Davis asked Arroyo how the government found out about the September 14 cocaine in the turbofan. Arroyo responded, "[by] X-Ray machine," rather than by screwdriver. Government Ex. Two, at 15. According to Davis' interpretation of Arroyo on tape, Davis had given Arroyo a gold Rolex watch with which to purchase this cocaine from Rivera. Arroyo allegedly was unsuccessful and had to leave the warehouse because the DEA agents were conducting the search and "they put [Rivera] on the wall, everybody on the wall don't move." Id. at 16. No DEA agents testified that Arroyo had shown up, and no DEA record reflects that Arroyo had been present. The tape recording reflects, however, that Arroyo agreed with Davis; "this was strictly Wil-

ly's cocaine." Id. at 17. This cocaine forms the basis for Count Seven of the indictment (importation), on which Arroyo was convicted. Count Eight of the indictment (possession with intent to distribute), on which Arroyo was acquitted, relates to cocaine that was allegedly possessed on or about September 14; it is not clear whether the alleged cocaine was the cocaine seized or some other, unmentioned cocaine.

Davis further testified that Arroyo and Rivera went to Davis' house on July 11, after the alleged July 5 importation in a turbofan (of which Arroyo was acquitted), to sell Davis one-half kilogram of this cocaine. This cocaine appears to be the same cocaine that was allegedly imported on July 5, although no testimony directly addressed the source of this cocaine. Davis did not say that the cocaine was Arroyo's. Rather, Davis testified that Rivera pulled out a bag and handed it to Arroyo, who allegedly pulled out 16 ounces of cocaine and suggested that Davis buy it. Davis testified that Arroyo said that "he [Rivera] was bringing in four kilos per month in turbine engines." Appeal Record, Vol. 8, at 89. Davis allegedly obtained the money from De La Garza and purchased this one-half kilogram, which forms the basis for Arroyo's convictions on Counts Three (possession with intent to distribute) and Four (knowing and intentional distribution).

On July 19, Davis was arrested for carrying a gun when he drove up to a convenience store with a pistol between his knees. Davis stated that he requested that the police call the DEA to confirm that he was working for the Agency. The original arresting officer testified that Davis also stated that if he were not allowed to leave, someone would be seriously injured. When Agent Norman was finally called, he denied that Davis was currently working on a case or that Davis was permitted to carry a gun. The next day, July 20, Agent Norman closed the case on Arroyo without any attempt to verify what contacts Davis may

---

1. The conversation was recorded during a meeting in a restaurant parking lot on December 20, 1984, after Agent Muller wired Davis for sound

with a "KEL" transmitter to obtain evidence on Rivera. December 20, 1984 marks the end of the alleged conspiracy.

have had with Arroyo. Davis posted a bond on this charge, which he forfeited by failing to appear in court. Agent Muller "found out the information" required for Davis to plead guilty, to pay a fine less than the bond, and (possibly) to recover his bond.

Davis allegedly continued to transact business with Arroyo. They allegedly worked out an arrangement that included De La Garza, in which Arroyo would drive to Monterrey, Mexico to meet a "mule" (a carrier of cocaine between countries) coming from La Paz, Bolivia. This mule may have been an individual named Manolo, from whom Davis and De La Garza, and allegedly Arroyo, apparently obtained Bolivian cocaine. Arroyo was to meet Davis and De La Garza at a particular bar in Monterrey—which Davis later testified does not exist in Monterrey—or alternatively at the airport in Matamoros. Arroyo allegedly met Davis when their cars passed by each other en route to the alternative meeting spot. There, the mule sold the cocaine to De La Garza, who gave the cocaine to Arroyo. Arroyo initially refused to accept the cocaine, but allegedly acceded to driving the cocaine across the border around August 1. This importation forms Count Five of the indictment, on which Arroyo was acquitted.

Arroyo's mother testified that Arroyo was in Bolivia for about ten days during the summer. It appears that Arroyo went to solicit funds to help his ailing empanada business. Customs records indicate that Arroyo was out of the country during this period, because he returned to the United States on August 5. The records also indicate that Arroyo returned by plane through Miami. Other customs documents reveal no record of Arroyo's car crossing the Mexican border into the United States during this time.

After allegedly importing this cocaine around August 1, Arroyo allegedly took the cocaine to his home. The cocaine apparently was bonded to cardboard inserts of a briefcase, which required "boiling down" to remove the cocaine from the cardboard. Arroyo, on tape, later discussed how Manolo was "pissed off with the cardboard." Government's Ex. Two, at 8. The cocaine removed from the cardboard was transformed at a "miniwarehouse" into cocaine hydrochloride crystals, a useable and saleable form. De La Garza and Davis obtained the cocaine, and De La Garza allegedly paid Arroyo between $500 and $2,500 for completing the importation. Davis stated that he used some of this cocaine, and sold the rest. These events form the basis for Count Six (knowing and intentional distribution), on which Arroyo was acquitted.

After this time, Davis and Arroyo were allegedly in further contact to import cocaine in turbofans. Agent Norman and Davis testified that they had met in the early afternoon on September 14, and Davis had indicated that a turbofan shipment of cocaine was in Houston, a prime opportunity for a drug bust. (This is the shipment that the DEA seized, and for which Arroyo was convicted of importation). Davis accused De La Garza of "double dealing" with the DEA at that meeting, and Agent Norman apparently agreed to arrest De La Garza and "put a leash on him," i.e., gain more control over him. Davis testified that he went with De La Garza and Arroyo to a parking lot in Northwest Mall, near the warehouse of Rivera, at about five or six o'clock. Agent Muller testified that the search was performed just before two in the afternoon and lasted less than three hours. Davis testified that he gave Arroyo his gold Rolex watch with which to trade for cocaine from Rivera, which came in the turbofan shipment. Arroyo stated on tape that the search was in progress when he arrived. Davis also stated that he was waiting at a particular hotel for a call from Arroyo after the alleged attempt to buy. The hotel's records showed that Davis and Robert Vaught—who apparently paid Davis' hotel bills—had rooms at times before this date, but not on this date nor for many weeks thereafter.

At some point after this night, Davis provided a statement to Agents Norman and

Muller. The statement, signed by Agents Norman and Muller, indicated that it was provided on September 18, and described Davis' activities concerning Rivera and the turbofan shipment. The statement could not have been made on that date, however, because Davis testified that he was in Corpus Christi until September 19, when he called Agent Norman. The statement describes that he met Willy (Rivera) through "a mutual friend," and that he met with Rivera on September 12 about the turbines. Arroyo's name is not mentioned in the statement.

Davis testified that he helped to plan for De La Garza and Arroyo to go to Bolivia after the September 14 bust, to obtain cocaine from Manolo in cardboard form. On September 15, Davis had a meeting with Agent Muller. Davis allegedly went to Corpus Christi on September 16, to wait for De La Garza and Arroyo to call, at which time he would meet them at the Mexican border. On September 18, De La Garza and Arroyo encountered trouble in Bogota, Columbia, a stopover in their trip from Bolivia to Mexico City. Augustin Arbelaez, a police officer at the Bogota airport, testified that De La Garza's luggage had been marked with a special tag by airline personnel, to indicate suspicious activity. Arroyo, on tape, indicated that he had urged De La Garza not to "hang around" the airport, because it would cause officials to become suspicious. Arroyo stated that this was why he and De La Garza were detained before the flight was to leave. Davis testified that Agent Norman may have been involved in De La Garza's arrest, and that De La Garza may now be dead. The Columbian officials inspected the bags in the police office; two of De La Garza's three suitcases contained cardboard-impregnated cocaine. This cocaine is the subject of Count Nine (attempted importation), on which Arroyo was convicted.

Arroyo's one suitcase contained primarily underwear and socks. De La Garza was arrested, but Arroyo was permitted to leave on his flight after being briefly questioned by Arbelaez. Arbelaez testified that Arroyo stated that he had just met De La

Garza at the airport in La Paz, and had attempted to help De La Garza with the language.

Arbelaez also testified regarding statements made by De La Garza at the airport after Arroyo had left. The defense obtained a suppression hearing before admission of these statements, arguing, *inter alia*, that they were inadmissible co-conspirator hearsay under *United States v. James*, 590 F.2d 575 (5th Cir.1979) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Judge Bue admitted the De La Garza hearsay statements, creating the error underlying our review. In particular, Arbelaez stated:

> When Jorge Arroyo left, Dan De La Garza stated to me that he needed to communicate urgently with an agent of the D.E.A. or with some person in the United States Embassy since he desired to tell them that they should carry out an interception of Jorge Arroyo before he arrived in Mexico because he, as soon as he arrived there, was to carry out a communication. And that in that case, it would be to tell someone that he, Daniel Steven De La Garza, had fallen in Bogota.
>
> . . . .
>
> With regards to that [cocaine] shipment, he stated to me that it was a new system of transportation that had been discovered some two months before. . . .
>
> . . . .
>
> He stated that he has traveled in the company of Jorge Arroyo and he did not comment that his passage, or that is that of Jorge Arroyo and that of him, that is Daniel Steven De La Garza, both had been purchased with his credit card, International Diner's Club.

Appeal Record, Vol. 11, at 33–35. Arroyo *apparently called Davis upon returning to* the United States, and Davis apparently called the DEA on September 19 to inform them that De La Garza had been arrested.

Agent Norman debriefed Davis on October 19, who was clearly established as a

numbered, confidential informant working with Agent Muller by October 22. Agent Norman testified that he met with Davis on October 20, and discussed the possibility of purchasing 60 kilos of cocaine from Arroyo's alleged supplier, a Bolivian Major who was flying cocaine into the United States. Agent Norman and Davis allegedly arranged and held a meeting with an individual named Lucho, an individual named Roberto, and Arroyo, at a hotel in Houston on October 24. There, the five men discussed the possibility of purchasing cocaine, and at some point a figure of 1,000 kilograms was mentioned. Roberto and Agent Norman went up to a hotel room, prepared in advance by the DEA to videotape- and audiotape-record any conversation in the room. Agent Norman testified that he showed Roberto $1.9 Million that was in the room. Something on the order of 15 DEA agents were providing security at the hotel that night, in part because of the money.

Roberto allegedly indicated to Agent Norman that he wanted to deal directly, rather than through Arroyo, because Arroyo was responsible for the inability to provide the cocaine. Davis testified that Arroyo allegedly stated that the Bolivian Major's cocaine was already on its way to Florida. Agent Norman testified that, at another meeting held on October 29, Roberto agreed to provide cocaine from the next shipment to Agent Norman.

At trial Davis interpreted some of Arroyo's comments on tape, which allegedly referred to a deal between Arroyo and Davis in November or December. Arroyo allegedly gave Davis one ounce of cocaine that Arroyo had obtained from Roberto. Davis was to pay Arroyo $1400 after selling the cocaine, but Davis did not pay Arroyo. Since Arroyo could not repay Roberto, "Roberto and two other individuals with shotguns, machine-guns or something, came to his home and forced he [Arroyo] and his wife to sit on the sofa while he [Roberto] extracted jewelry, record player, TV, or whatever...." Appeal Record, Vol. 9, at 3. Agent Norman testified that Arroyo indicated, during an unrecorded telephone conversation on December 6, that Roberto had somehow removed himself from the deals they allegedly had agreed to. Nothing further is known about these transactions. The tapes of the October 24 meeting were "routinely" destroyed when Agent Norman closed this case on March 11, 1985.

Sometime in October or November 1984, Davis allegedly indicated his desire to leave the DEA, but agreed to return when Agent Norman allegedly agreed to attempt the arrest of the large dealers. On December 20, Davis had a conversation with Arroyo, from which the taped admissions were obtained. On tape, Arroyo expresses distrust of Agent Norman, discusses Lucho, an apparently lazy broker who would sleep through drug deals, and Roberto. He makes a damaging admission by saying "yes," when Davis asks him if Lucho is "brokering it [cocaine] like you and me." Government's Ex. Two, at 4. Arroyo also admits to knowing that Lucho's supply derives from a corporate partnership that is importing cocaine in sides of beef carried on supertankers, that Manolo was to import a ton of cocaine by airplane, and that one of Yasser Arafat's alleged wives, sisters, or brothers has a brother who was to purchase this cocaine—or other cocaine in Bolivia—to sell in the United States to support the Palestine Liberation Organization. Id. at 5, 9–11.

Davis also testified that Arroyo was making small deals from approximately this time until March 22, 1985, at which time Davis was arrested. Davis said that Arroyo had gone into business for himself, rather than just acting as a broker. Davis allegedly had given Arroyo a fake Rolex watch with which to attempt to purchase cocaine from the Bolivian Major. Davis testified that his own arrest by Agent Norman, for illegal distribution of—possibly DEA-provided—cocaine, was set up to silence Davis.

This sleazy saga of illusory illegality concludes with Arroyo's arrest, and the filing of the original grand jury indictment against Arroyo and Rivera on March 27, 1985. Agent Muller testified that Rivera,

Roberto, and Lucho either are fugitives or have disappeared, and that the DEA is continuing the investigation to find them. The indictment against Arroyo was later modified to include four additional counts, to extend the conspiracy from September 14, 1984 to December 20, 1984, and to delete Rivera's name from the indictment.

The case proceeded to trial before Judge Bue. During the course of two weeks, Judge Bue disqualified an initial jury, empanelled a second jury, permitted Agent Muller to remain throughout the trial as the agent for the case, held various hearings, and guided the proceedings through evidence and argument. After the close of evidence, the defense moved for a mistrial on the *James* grounds raised at the suppression hearing. Before instructing the jury, Judge Bue denied that motion, as well as a motion for a directed verdict of acquittal. Instead, Judge Bue issued a "curative" instruction that the jury should not consider the De La Garza hearsay. After the jury verdict, the defense moved for a new trial on the *James* grounds. Judge Bue granted that motion. The Government takes this appeal.

II. Review of Judge Bue's Grant of New Trial

■ We review an appeal by the government of a new trial grant for abuse of discretion by the trial court. *United States v. Leal*, 781 F.2d, 1108, 1110 (5th Cir.1986); *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir.1985). The Government does not contest on appeal the propriety of Judge Bue's determination that he had erroneously admitted the hearsay testimony of Augustin Arbelaez, because De La Garza's statements to Arbelaez were not made in furtherance of the conspiracy. *See United States v. James*, 590 F.2d 575 (5th Cir.1979) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); *cf. Leal*, 781 F.2d at 1111 (overturning a grant of a new trial, because the judge had erred in determining that an evidentiary error had occurred). Rather, the Government argues that Judge Bue erred by granting a new trial on the basis of the *James* error, because he failed

to apply or misapplied harmless error analysis, thereby abusing his discretion.

■ In particular, the Government contends that Judge Bue improperly failed to exercise his discretion by considering only certain, limited information and by neglecting his duty to examine the record carefully. Further, the Government argues that, given the permissible testimony and documents in evidence and the fact that the jury split its verdicts, purportedly demonstrating the salutary effects of the curative instruction, a harmless error determination is mandated. Had Judge Bue properly applied harmless error analysis to the wrongly admitted co-conspirator hearsay statements, he would have found the error to be harmless and thus would not have granted a new trial. The Government thus concludes that "the grant of the new trial was error, because on the facts of this record the admission of de la Garza's statements was harmless beyond a reasonable doubt." Reply Brief of Appellant at 3.

These contentions are wholly devoid of merit, and demonstrate that the Government has failed to read or has misread Judge Bue's order. Judge Bue clearly and explicitly chose to consider and to apply harmless error analysis to the evidentiary error. In his order, Judge Bue specifically references the Government's response to the new trial motion, which attempts to characterize the hearsay as harmless error because of the presence of alternative, permissible evidence. Appeal Record, Vol. 1, at 53. Judge Bue stated that he did "not believe that cumulative evidence exists which would cure the erroneous admission of the co-conspirator's statements, nor [did he] believe that the cautionary instruction cured the admission as evidenced by the guilty verdict on the counts in the indictment." *Id.* at 55.

Further, by referring to certain, particular pieces of information before him, Judge Bue did not, as suggested by the Government, fail to consider the evidence or other elements of the trial, nor merely throw up his hands in dismay at the complexity of the question before him. To invoke the time-worn maxim of construction "*expres-*

*sio unius est exclusio alterius*" in this context, as the Government implicitly advises, would be wholly inappropriate. Judge Bue merely listed some of the information he considered in his decision, which included the full testimony of the trial over which he attentively presided, and the new trial motion and the Government's response that were before him.

In addition, after the close of evidence, Judge Bue held a mistrial hearing at which he specifically addressed whether his admission of the De La Garza hearsay was in error and whether the error was curable. Judge Bue pointedly asked the Government what cumulative evidence existed. At that point, Judge Bue ruled that although the admission was error, the error was curable. As we stated in *James*, 590 F.2d at 583, "the judge must decide whether the prejudice arising from the erroneous admission of the coconspirator's statements can be cured by a cautionary instruction to disregard the statement or whether a mistrial is required." It is possible that Judge Bue denied the mistrial motion to avoid the need for a second trial were the jury to acquit or were he again to rule in error; if he were to grant the motion, there would be no jury verdict to reinstate. Thus, when provided with the jury verdict and the subsequent motion for new trial, Judge Bue found, on the basis of identical evidence, that the error was not curable.

Finally, Judge Bue stated that "[a]fter reviewing the indictment and the jury verdict as to each count, as well as the time frame within which De La Garza made the statements to Arbalaez, it is impossible for this Court to carve-out and surgically isolate those portions of the indictment *and subsequent verdict that were not tainted by the introduction of the poisonous testimony.*" Appeal Record, Vol. 1, at 55 (emphasis added). Judge Bue thereby properly applied the harmless error standard for nonconstitutional error. Fed.R.Crim.P. 52(a), Harmless Error ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."); *Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946) ("the question is ... what effect the error had or reasonably may be taken to have had upon the jury's decision.... If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress.") (footnote omitted). On the basis of this record, there can be no doubt that the testimony nontrivially could have affected the jury's verdict or judgment. Judge Bue's determinations that the instruction did not sufficiently cure the error, that the error was harmful, and that a new trial was required fully complied with the applicable laws and therefore did not abuse his discretion.[2] *See* Fed.R.Crim.P. 33 ("A court on motion of a defendant may grant a new trial to him if required in the interest of justice.").

■ We commend Judge Bue's thoughtful—and uncommon—decision to correct

---

2. Because we find that Judge Bue did not abuse his discretion by applying *non*constitutional harmless error analysis to grant a new trial, we need not decide whether the improper hearsay admissions constituted *constitutional* error under the Confrontation Clause of the Sixth Amendment, *see United States v. Phillips*, 664 F.2d 971, 1027 n. 84 (5th Cir.1981); *cert. denied sub nom., Meinster v. United States*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Castillo*, 615 F.2d 878, 883 (9th Cir.1980), under the Fifth and Fourteenth Amendment Due Process Clauses, *see Spencer v. State of Texas*, 385 U.S. 554, 563–64, 87 S.Ct. 648, 653, 17 L.Ed.2d 606 (1967) (fundamental elements of fairness required in criminal trials) (citing cases), nor under other provisions of the Constitution. As a result, we need not decide whether prejudicial tainting of the cumulative evidence adduced at trial or of the jury's ability impartially to consider that evidence, caused by impermissible admission of hearsay, rises to the level of constitutional error and thereby requires mandatory reversal rather than harmless error inquiry. *See Rose v. Clark*, —— U.S. ——, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986) ("the Court in *Chapman* [*v. California*, 386 U.S. 18, 23 n. 8, 87 S.Ct. 824, 828 n. 8, 17 L.Ed.2d 705 (1967),] recognized that some constitutional errors require reversal without regard to the evidence in the particular case.... *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (adjudication by a biased judge). This limitation recognizes that some errors necessar-

599

his own error before we were required to do so. We further note that an appellate court should be extremely reluctant to second guess, on the basis of a paper record, the decision of a trial judge that insufficient cumulative evidence exists to cure a trial error, that the jury's considerations could have been affected by the error, or that the error was not cured by the instructions. The trial judge has an opportunity directly to observe the witnesses and the jury, and he is thus in a substantially better position on a motion for a new trial to determine in the interests of justice whether an error is harmful. We should not, by applying the harmless error standard, substitute our judgment of law for the discretion and direct perceptions of the trial judge, unless those perceptions form an abuse of the judge's discretion. The decision of the district court to grant Defendant Arroyo a new trial is AFFIRMED.

ily render a trial fundamentally unfair.... Harmless error analysis thus presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury.") (footnote and citations omitted); *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969) ("We do not suggest that, if evidence bearing on all the ingredients of the crime is tendered, the use of cumulative evidence, though tainted, is harmless error."); *Coleman v. Kemp,* 778 F.2d 1487, 1540 n. 24 (11th Cir.1986), *reh. denied sub nom. Isaacs v. Kemp,* 782 F.2d 896 (11th Cir.1986) (en banc), *cert. denied sub nom., Kemp v. Coleman,* —— U.S. ——, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986) (harmless error analysis inapplicable when a defendant has been denied a fair trial before an impartial jury).