UNITED STATES of America,
Plaintiff–Appellant,

v.

Jonathan LOGAN, Defendant–Appellee.

No. 87–1774.

United States Court of Appeals,
Fifth Circuit.

Dec. 16, 1988.

Sidney Powell, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Dallas, Tex., for plaintiff-appellant.

E.X. Martin, III, Dallas, Tex., for defendant-appellee.

Before BROWN, GEE, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

In a jury trial in the United States District Court for the Northern District of Texas, defendant-appellee Jonathan Logan was found guilty on all three counts of an

indictment charging him with knowing possession, on or about June 9, 1986, of heroin, cocaine, and marihuana, while he was an inmate of a federal correctional facility, contrary to 18 U.S.C. §§ 1791(a)(2) and (b)(2). The district court granted Logan's timely post-verdict motion for new trial predicated on the sole ground that he testified at trial in reliance on his counsel's erroneous advice that his several prior convictions could not be admitted in evidence so long as he did not put his character in issue. The government appeals the order granting a new trial, as authorized by 18 U.S.C. § 3731, as amended in 1984. Pub.L. 98–473, Title II, § 1206, 98 Stat. 2153. Determining that the record affords no adequate basis for finding a reasonable probability that but for defense counsel's erroneous advice the result of the proceeding would have been different, we conclude that the district court abused its discretion in granting a new trial. We therefore reverse the new trial order, and remand the case for reinstatement of the verdict and further proceedings not inconsistent herewith.

### Facts and Proceedings Below

At Logan's trial, the government, primarily through the testimony of two correctional officers at the federal correctional institution in Seagoville, Texas, established that the narcotics in question were found wrapped in a sock in a laundry bag in the cell that Logan shared with one other inmate at Seagoville. Testimony of a chemist likewise established that the substances were heroin, cocaine, and marihuana. The testimony of the correctional officers was not conclusive of Logan's guilt, however, because it did not clearly establish that the laundry bag in question was Logan's, as opposed to being his cellmate's, and because the officers admitted that the cells were unlocked and other inmates could freely enter and leave, although they indicated that this would normally be noticed. Neither correctional officer was sure whether there was only one, or two, laundry bags in the cell, and they were likewise uncertain as to whether only one, or two, laundry bags had been searched. Their testimony also exhibited some confusion as to whether the bag in which the narcotics were found was properly described as brown or green or greenish-brown. However, there was no dispute about the fact that the narcotics had been found concealed in a rolled up sock in a laundry bag hung from a double-decker bunk in the cell Logan shared with one other inmate. After the discovery of the narcotics, the FBI was called and Agent Westberg came to Seagoville the following day and interviewed first Logan's cellmate and then Logan. Questioning Logan about the narcotics found in the cell, Westberg testified:

"A.  ... I asked him if everything in the green laundry bag was his, to which he said, yes, everything in the green laundry bag was mine. And I said, 'Even the narcotics,' to which he said, 'I told you, everything in the green laundry bag is mine.'

"Q. Did he appear confused or as though he didn't understand what you were talking about when you asked him everything in the green laundry bag including the narcotics?

"A. Yes—no, he was not confused at all."

Westberg unequivocally repeated this testimony on cross-examination. However, he admitted that in his notes or report concerning this interview he did not attribute to Logan the words "I told you, everything in the green laundry bag is mine." Rather, Westberg said that his notes reflected that Logan responded to the inquiry as to whether his statement about everything in the bag being his included the narcotics "in a positive manner and moving his head up and down." Westberg was then asked:

"Q. But you didn't say anything [in the report] about Mr. Logan saying, 'Yes, everything in the bag is mine,' did you?

"A. No, I don't have that. I don't have that here, but that's a quote exactly of what he said."

The defense evidence consisted only of the testimony of Logan. Logan admitted that the green laundry bag was his, but denied any knowledge of the narcotics or how they got in that bag. Concerning his

interview with Westberg, Logan testified in relevant part as follows:

"He asked me did I own or did a green duffel bag belong to me, and I told him that I had a green duffel bag. And he asked me was there things in it mine, and I told him yes in reference to the clothes. Then he asked me did the drugs also belong to me, and I told him that I didn't have any knowledge of drugs being in the bag. And he told me that there were, so I told him I didn't know anything about it."

Logan also testified that his cellmate had a brown laundry bag and that "[w]e shared both bags." Following the completion of Logan's direct examination, there was an unrecorded bench conference held at the request of government counsel. Cross-examination of Logan then revealed several prior convictions, all without any objection being made to any of the inquiries, as follows: in 1978 he was convicted of distribution of heroin and sentenced to fifteen years, but was paroled after six and a half years; he was sent back to prison for a parole violation when his urine specimen reflected narcotics; he was also convicted of sale and possession of heroin in 1972 and sentenced to life imprisonment, and subsequently paroled in 1977; and in 1966 or 1967, he had been convicted of felony assault. Logan then again testified that all the laundry in the green bag was his. Concerning his interview with Westberg, he admitted that prior to the interview he had read the Seagoville official incident report which stated that narcotics had been found in a green laundry bag in his cell, and that he was "aware of what had been found in his room in the green duffel bag before you were interviewed by Agent Westberg." Logan further testified on cross-examination in this connection that:

"Mr. Westbrook [sic] asked me if the green duffel bag was mine, and I acknowledged that it was. He asked me was the things in it mine, and I told him, yes, that they were, the clothes. He then asked me did it include narcotics or something like that, and I told him, no, that I wasn't aware of any narcotics being in the duffel bag."

Logan also stated that Lieutenant Rosales, of the Seagoville staff, was present during his interview with Westberg.

In argument to the jury, the government referred to Logan's prior convictions, but only in two brief sentences, each reference being to the fact that the jury could consider Logan's prior convictions in determining the credibility of his testimony. The district court's charge likewise informed the jury that it could consider a witness' prior convictions for the purpose of determining his credibility. However, the court also charged that the fact of prior conviction "does not necessarily destroy the witness' credibility," and further, that prior convictions could not be considered for any other purpose than credibility.

The case was submitted to the jury late on Friday afternoon. Shortly, the jury sent in a note asking for several items of factual information about various matters, including the color of the bag and what Logan's cellmate had been convicted of. After consultation with counsel, the court gave the jury a lengthy instruction, in essence stating they could decide the case only on the basis of the evidence and to use their best recollection of the testimony. The court also stated that if the jury had more specific questions, it would consider entertaining them, and suggested that the jury might want to recess for the weekend. The jury was then again returned to the jury room and at 5:15 p.m., about twenty-five minutes after the jury's first note, informed the court that it wanted to recess until Monday. Court was recessed, and jury deliberations resumed Monday morning, apparently about 8:30. Shortly after 9:00 a.m., the jury sent in a note requesting a copy of the transcript of the trial. The court informed the jury that this was not practical, but that if a specific portion of a specific witness' testimony were requested, that could be furnished. Shortly after 11:00 a.m., the jury sent in another note requesting testimony on numerous different points, including the correctional officers' testimony about the bag, Logan's testimony about where it was located, several portions of Westberg's testimony, and tes-

timony concerning revocation of Logan's parole. After consultation with counsel, the court informed the jury that its request was too voluminous, and that it should try to narrow its requests to more specific areas. At 11:30 a.m., the jury requested Westberg's testimony concerning what Logan said to him about the laundry bag. The court then recessed the jury for lunch with instructions to return at 12:30 p.m. After the jury returned, the court had the jury read the relevant portions of Westberg's testimony concerning what Logan had told him about the laundry bag. Twenty minutes later, the jury returned with a verdict of guilty on all counts. The verdict was duly accepted and the jury discharged, all without any objection. The court then set sentencing for a date some two weeks later.

Nine days after the verdict, Logan, through his trial counsel, filed his motion for new trial.[1] The sole ground on which a new trial was sought was that prior to trial Logan had asked his counsel if his prior convictions would be admissible if he testified, and that counsel had responded that they would not be unless he had put his good character in issue. The motion also stated that at the bench conference following Logan's direct testimony, the court informed defense counsel that Logan's prior convictions could be inquired into on cross-examination. Defense counsel swore that the foregoing allegations were true. The motion also asserted that Logan believed that his counsel's referenced statements to him about the inadmissibility of his prior convictions amounted to ineffective assistance of counsel, depriving him of a fair trial. The motion for new trial does *not* assert that counsel would not have advised Logan to testify, or would not have put him on the stand, but for misapprehension concerning the admissibility of his prior convictions; nor does it assert any other change in trial conduct or preparation occasioned by the mistaken view of the admissibility of prior convictions. Nor does the motion assert any prejudice resulting from the misadvice.

The government opposed the motion for new trial, sentencing was deferred, and some two months later an evidentiary hearing was held on the motion for new trial with Logan at this time being represented by new counsel. The only evidence at the evidentiary hearing was Logan's testimony. He stated that the allegations in the motion for new trial concerning what his attorney had told him prior to trial about the inadmissibility of his prior convictions were true; and that had he known that he could be impeached by cross-examination concerning his prior record if he testified, then he would not have testified. On cross-examination, Logan admitted that in his trials leading to his previous convictions his counsel advised him not to testify, and he did not testify. He stated he did not know the reason his counsel had advised him not to testify, but his counsel in the earlier cases had told him that his prior record would come out if he did testify. There was no evidence or suggestion of how Logan would have done things differently had he not been misadvised by his counsel in respect to the admissibility of his prior convictions, except the fact that he would not have testified. There was no evidence of what his counsel would (or should) have done or advised had he understood Logan could be impeached by his prior convictions if he testified. There was no evidence of any other defect in representation by counsel.

The district court granted the motion. Although its written order does not state any reasons, other than consideration of the motion and the testimony at the hearing on it, the court did explain its reasons at the conclusion of the hearing. The court stated in this connection:

"And probably if this were not the fact that it's—and I think going to be a very brief trial—it was not a long trial, to begin with. I think the grounds for the

---

**1.** While Fed.R.Crim.P. 33 allows only seven days after verdict for a motion for new trial (other than one on newly discovered evidence), the instant motion was timely because of the provision of Fed.R.Crim.P. 45(a) excluding intermediate Saturdays, Sundays, and legal holidays from the computation of prescribed periods less than eleven days.

new trial are as shaky I [*sic*] as they can be. But I'm not convinced—since there was a question, obviously, in the jury's mind of credibility of the witnesses—that I could say that it did not—would not have changed the outcome of the trial.

"I think the evidence really was overwhelming as presented by the Government. I cannot in good conscience say it wouldn't have changed the outcome, because the jury seemed to have some problem with credibility of the witness. And I think the shortness of the trial was—is probably what leads me to believe that in justice that on balance that the case can be retried without great expense.

"It is not often that an attorney, practicing attorney, comes before the Court and confesses ineffective assistance of counsel on a matter that is rather basic. And I just have to consider whether I think, overall, justice was done.

"I have no quarrel with the way the Government tried the case.... [I]t was not something that I feel that in any way the Government is responsible for, but it is just an area of my discretion I'm just going to exercise in favor of the defendant in this case."

## Discussion

As stated in *United States v. Arroyo*, 805 F.2d 589, 597 (5th Cir.1986):

"We review an appeal by the government of a new trial grant for abuse of discretion by the trial court. *United States v. Leal*, 781 F.2d 1108, 1110 (5th Cir.1986); *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir.1985)." [2]

But, of course, in order to assess whether or not the district court abused its discretion in ordering a new trial, we must first determine the standards to be applied by the district court in making that decision in the particular case. Here, the only asserted ground for new trial was counsel's ineffectiveness in advising Logan that if he testified he nevertheless could not be cross-examined concerning his prior convictions unless he had first put his good character in issue. It is important, in this connection, to note that this is the only claim of ineffective assistance of counsel, and that the motion for new trial did not assert, and the district court did not find, any other aspect in which counsel was assertedly defective. Moreover, our examination of the record reflects that in other respects defense counsel was fully effective and did a vigorous and capable job at trial and apparently before trial as well. His cross-examination and argument were professional and well prepared and counsel had, apparently through his several discovery motions, procured and familiarized himself with the previous statements and reports of the

2. There are relatively few reported decisions involving an appeal by the government from the grant of a motion for new trial in a criminal case, doubtless due in part to the fact that, exceptional circumstances aside, such an appeal has only been authorized since late 1984. In *Martinez*, the Eleventh Circuit reversed a new trial granted in part on account of an asserted discovery violation. The Court held that the complained of conduct did not constitute a discovery violation, and even if it did, the defendant was not prejudiced by it. *Id.*, 763 F.2d at 1314–15. In *Leal*, we reversed the grant of a new trial on account of the assertedly erroneous admission of taped conversations of the defendant which the trial court apparently felt were hearsay. We held the statements were not hearsay and thus "the new trial order was unjustified." *Id.*, 781 F.2d at 1111. In *Arroyo*, we sustained the grant of a new trial on the basis of erroneously admitted hearsay. We concluded that the evidence had been erroneously admitted, and that the trial court had "properly applied the harmless error standard" and that "there can be no doubt that the testimony nontrivially could have affected the jury's verdict." *Id.*, 805 F.2d at 598. *Arroyo* involved a complicated, "surreal," multicount narcotics and conspiracy prosecution, and we emphasized the superior position of the district court in determining whether the admission of certain evidence was harmless, concluding that we should not substitute our judgment for its, absent "an abuse of the judge's discretion." *Id.* at 599. *See also Nilson Van & Storage v. Marsh*, 755 F.2d 362, 367 (4th Cir.1985) (new trial for erroneous instruction reversed where instruction not erroneous); *United States v. Greene*, 834 F.2d 86, 88–89 (4th Cir.1987) (affirming award of new trial where twenty-one exhibits never offered or admitted in evidence were mistakenly sent to the jury during its deliberations; trial and appellate courts both impressed by the potential significance of the evidence; case against the defendant was barely sufficient in trial court's view).

government's witnesses. In short, this case does not even arguably involve general ineffectiveness. Rather, we are dealing with a single, discrete error by counsel.

■ We have no difficulty whatever with the district court's conclusion that counsel's specific advice in respect to the inadmissibility of Logan's prior convictions was outside the wide range of professionally competent advice and did not constitute the exercise of reasonable professional judgment. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). The government argues, however, that in order for a new trial on this ground to be appropriate, the district court must also have found, with adequate record support, that the particular deficiency in representation was prejudicial to Logan under the standards enunciated in *Strickland.*

■ As an abstract matter, it might well be argued that the *Strickland* standards of prejudice should be applied only in collateral attacks, and that a somewhat more lenient standard ought to be utilized when the district court considers a motion for new trial. However, in *Strickland,* the Court said: "The principles governing ineffectiveness claims should apply in federal collateral proceedings as they do on direct appeal or *in motions for a new trial." Id.* 104 S.Ct. at 2070 (emphasis added). We believe this is particularly appropriate where, as here, we are dealing only with a single, discrete error of counsel which at the most affected a choice of trial strategy and did not lead to the failure to present exculpatory evidence or to the admission of evidence generally regarded as inadmissible. The truth-seeking function of the trial was not perverted. Logan gave his exculpatory evidence, and although this was at the price of having the credibility of that

testimony judged in light of his prior convictions, that is the price which our law regularly exacts of a testifying defendant. The alternative would have been to avoid disclosing the prior convictions, but then that would have been at the price of Logan's not testifying, and thus being unable to present any defense. It is plain that a trial strategy of having Logan testify, even though his prior convictions would be thus exposed, would not have been even arguably unreasonable in the circumstances of this case. We conclude, therefore, that in order to properly grant a new trial on such a ground, the district court must be able to determine that the *Strickland* prejudice test is met.[3]

■ *Strickland* makes plain that there is no presumption of prejudice from one or more discrete instances of ineffectiveness on the part of defense counsel. *Id.* at 2067. Rather, "the defendant must show that they actually had an adverse effect on the defense," *id.,* and "a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 2069. In this connection, it is not enough to show "that the errors 'impaired the presentation of the defense' " or that they "had some conceivable effect on the outcome of the proceeding." *Id.* at 2067. Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 2068.[4] Here, the record does not fairly support a conclusion that, but for counsel's response to Logan's inquiry concerning the admissibility of the prior convictions, the jury verdict would in reasonable probability have been any dif-

---

3. We also note that in acting on new trials generally, the harmless error rule is usually appropriate. *See* Wright, *Federal Practice and Procedure: Criminal 2d* § 551 at 237–38 ("[t]he court has discretion in passing on motions, but it should hold in mind the harmless error provisions of Rule 52, and refuse to grant a new trial if the substantial rights of the defendant were not affected" (footnotes omitted); 8A *Moore's Federal Practice* § 33.02[1] at 33–3 (2d ed. 1988 rev.) ("[t]he doctrines of harmless and plain

error as stated in Rule 52 apply to Rule 33 motions").

4. As we stated in *Lyons v. McCotter,* 770 F.2d 529, 532 (5th Cir.1985): "The prejudice required by the second part of the *Strickland* test is something considerably more than the possibility that an unreasonable error by counsel might have had some effect on the trial."

ferent. That being the case, it follows that the district court abused its discretion in granting a new trial on that basis.

The district court's remarks indicate that it was influenced by the fact that the jury "seemed to have some problem with credibility of the witnesses." And the court may have felt that in making the credibility choice between Logan's testimony and that of Westberg's, the jury was influenced by Logan's prior convictions. This is obviously not an unreasonable conclusion, nor is it in any sense unreasonable to conclude that the admission of the evidence of the prior convictions may have tipped the scales against Logan in the sense that on the exact same evidence, except for the convictions, the jury might not have found Logan guilty. But that is not the proper question, because under no possible theory could the evidence have been the same except for showing the prior convictions, as the prior convictions could have been excluded only if Logan did not testify. This is what the district court apparently overlooked. In that situation, the testimony of Westberg that Logan in effect admitted possession of the narcotics would have been unrebutted, and this would be so whether one looked to his trial testimony or to the notes he made of the conversation. As the district court noted, "the evidence really was overwhelming as presented by the Government." Yet, without Logan's testimony, that overwhelming evidence would have been unrebutted. Absolutely no suggestion whatever has been made as to what other defense Logan might have presented. It is true that the jury appeared somewhat confused, and had a difficult time arriving at a verdict. But there is no reason to suppose that this was not simply because it was impressed with Logan's firm denial of any knowledge of the drugs and his insistence that he had plainly made that denial to Westberg. As the Court stated in *Strickland:*

> "An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like.... The assessment of prejudice should proceed on the assumption

that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies of the particular decisionmaker...." *Id.* 104 S.Ct. at 2068.

Here, we can only conclude that a reasonable decision maker would have convicted Logan on the evidence below excluding all of his testimony, both his denial of guilt and his admission of his prior convictions. We find nothing in the record to support the reasonable likelihood of a different result. Nor is it evident that the district court found to the contrary. Rather, the district court appeared to put the burden on the government to convince it that the result would not have been different. The court stated, "I'm not convinced ... that it did not—would not have changed the outcome of the trial," and "I cannot in good conscience say it wouldn't have changed the outcome." The court was thus requiring the government to convince it that the outcome would have been the same. But that is the wrong test, for it was Logan's burden to convince the court that the outcome would reasonably likely have been different. We also note that the court observed, "I think the grounds for the new trial are as shaky ... as they can be," but ultimately decided to grant the new trial because it could not exclude the possibility of prejudice and was therefore going to exercise discretion in favor of Logan. Under *Strickland,* however, that is not the appropriate test.

### Conclusion

Because the district court applied an incorrect standard in ruling on the motion for new trial, and because a new trial could not have been justified had the correct standard been applied, as there is no basis in the record upon which it can be fairly concluded that Logan met his burden of showing that the jury's decision would reasonably likely have been different absent his counsel's erroneous response to Logan's inquiry, the district court abused its discre-

tion in ordering the new trial.[5] Accordingly, the order granting a new trial is reversed and the cause is remanded to the district court to reinstate the jury's verdict and for further proceedings not inconsistent herewith.

REVERSED and REMANDED.

JOHN R. BROWN, Circuit Judge, dissenting.

Although differing with the court, I find no fault with its thoughtful analysis of *Strickland* as such. However, I reject strongly the idea that *Strickland* should be the focus in this case. Indeed, this case presents a question way beyond the narrow confines of Logan's appeal.

In the high name of *Strickland* and its test of *legal* error, what the court does is effectually destroy the time-honored power and duty of a federal trial court to grant a new trial when that court senses that an injustice has been done. The court need not find a legal error. All that is needed is the Judge's feeling that a wrong (injustice) has been done.

This fundamental is reflected by Professor Wright's statement that "(i)t has long been understood that if the trial judge is not satisfied with the verdict of a jury, he has the right—and indeed the duty—to set the verdict aside and order a new trial." C. Wright *Law of Federal Courts* 634 (1984).[1]

This venerable right—and duty—of a United States District Judge, traced historically so carefully by Judge Parker of the Fourth Circuit—a pillar of the Federal Judiciary—is reflected in his words which we[2] have accepted concerning the grant or denial of a motion for new trial:

> [o]n such a motion it is the duty of the judge to set aside the verdict and grant a new trial, if he is of opinion that the verdict ... will result in a miscarriage of justice.... The exercise of this power is not in derogation of the right of trial by jury but is one of the historic safeguards of that right.

*Aetna Casualty & Surety Co. v. Yeatts,* 122 F.2d 350, 352–3 (4th Cir.1941).

Judge Parker emphasized that a trial judge has a duty to order a new trial when he feels that the trial over which he has presided has resulted in a miscarriage of justice. In Judge Parker's words:

> While according due respect to the findings of the jury, he [the trial judge] should not hesitate to set aside their verdict and grant a new trial in any case where the ends of justice so require.

*Id.* at 354.

Furthermore, a trial judge may order a new trial "whenever in the exercise of a sound discretion the trial judge thinks this action necessary to prevent a miscarriage of justice." *Id.*

Although both *Aetna* and *Bucon* were civil cases, this principle so eloquently expressed by Judge Parker of the right and duty of a trial judge to order a new trial when the Judge feels that to allow a verdict to stand would result in an injustice, is a lynchpin of our system of jurisprudence applicable equally to civil and criminal cases.

The intent of the Supreme Court in *Strickland* was never ever to limit this

---

**5.** Of course, "abuse of discretion" is a phrase which "sounds worse than it really is"; it is simply a legal term of art which carries no pejorative connotations of a professional or personal nature. See *Smith International, Inc. v. Texas Commerce Bank,* 844 F.2d 1193, 1199 n. 3 (5th Cir.1988).

**1.** Wright further points out that:
> On the one hand, the trial judge does not sit to approve miscarriages of justice. On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the

> findings of the jury, regardless of his own doubts in the matter. Probably all that the judge can do is to balance these conflicting principles in the light of the facts of the particular case. If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.

C. Wright *Law of Federal Courts* 635 (1984).

**2.** *See United States v. Bucon Construction Co.,* 430 F.2d 420, 423 (5th Cir.1970).

prerogative. Worse, it rides roughshod in fact over the Fifth Circuit's highly deferential standard calling for a *clear* abuse of discretion for review of granting a new trial.[3]

Meeting the demands of the Bar, indeed meeting the demands of Federal Judges on the firing line,[4] the Supreme Court in *Strickland* undertook to develop and then announce principled standards to apply in the currently challenging context of post-conviction relief for inadequate representation by counsel. It dealt primarily with resurrecting the past. Neither the case nor its circumstances dealt with the action which Federal District Judges should take in the context of an on-going trial or one not yet completed by verdict and judgment of conviction.

The court is quite correct in its capsulation of *Strickland:* there must be (i) conduct (or lack of it) by counsel not measuring up to professionally accepted standards of competent counsel; and (ii) such deficiency in legal representation must have prejudiced the accused.

I also accept—indeed as I cheerfully must in our system of hierarchial supremacy—that the Supreme Court has expressly stated that *Strickland* standards apply as well "on direct appeal or in motions for a new trial" 466 U.S. 668, 697, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674, 700 (1984).

But with the cherished fundamental of the power and duty of a Federal District Court to grant a new trial where the court thinks an injustice has been done, I cannot believe that by that simple aside, the Supreme Court meant to whittle away or eliminate that long-established, long-recognized, long-revered ultimate safeguard to liberty and justice.[5]

Here is where our standard of review becomes critical. As the court properly emphasizes by appropriate authoritative precedent and quotation, the appeal by the government of a grant of a new trial is judged by abuse of discretion.[6]

I can accept the proposition that the trial judge—in his earnest effort to assure a constitutionally fair trial to that most unfortunate of individuals, a convicted felon engaging in an asserted prison-based crime, probably made a *legal* error in granting a new trial.

But considering the concerns expressed by the District Judge which the court faithfully recites, including the basic fact that Logan's veracity was directly on the line, I

---

**3.** *United States v. Fowler*, 735 F.2d 823, 830 (5th Cir.1984) ("[T]he district court's denial of a new trial will be reversed only where a clear abuse of discretion is demonstrated."); *United States v. Vergara*, 714 F.2d 21 (5th Cir.1983). In both cases, this Court refused to overturn the denial of a grant of a new trial absent a showing of clear abuse of discretion. It would be anomolous to hold that this standard does not also apply to the granting of a new trial.

**4.** Not the least of these was this very Court. *See Washington v. Strickland*, 673 F.2d 879 nn. 11–20 (5th Cir.1982) Judge Randall's (now Judge King) opinion for us analyzed the great number of opinions in the various circuits regarding their efforts to distill workable, principled standards.

**5.** This is a most solemn, serious, judicial duty of a trial Judge. *See Newman v. United States*, 238 F.2d 861 (5th Cir.1956).

[Here the] relief being pursued was a request for a new trial because injustice had been done. That presented a solemn, serious matter, the solution of which was the very act of adjudication, the full exercise of the judicial function. This called for considerate deliber-

ation and decision as a Judge, weighing carefully all that would indicate whether justice or injustice had been the result. The very nature of the process negatived, therefore, the basis for the claim that a paper—the recanting affidavit—compelled automatically the grant of a new trial. To honor such a claim—to test right by paper form, not substance—would be abdication of constitutional duty....

*Id.* at 862.

**6.** *See United States v. Arroyo*, 805 F.2d 589, 599 (5th Cir.1986) ("We should not, by applying the harmless error standard, substitute our judgment of law for the discretion and direct perceptions of the trial judge, unless those perceptions form an abuse of the judge's discretion.") *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir.1980) ("This authority [to grant a new trial] should be exercised sparingly and with caution; nevertheless, the trial court has wide discretion in deciding whether to grant a new trial in the interest of justice. Corresponding to the district court's broad discretion is the limited scope of our review: we will reverse ... only if we find that rehearing to be a clear and manifest abuse of discretion.")

868

cannot find that acting on these reasons the Judge can be faulted. Any such conclusion reflects such indifference to reason and settled principles by the Judge as to come within that most damning of all criticisms—the judge abused his discretion. No matter how tempered down or submerged in euphemistic poetry of appellate opinions, this means: the judge acted wholly outside of law and reason; the judge abandoned all principles; the judge acted for reasons or purposes in no way supported or justified by right thinking, right acting judges.

As to the element of prejudice, we are to view this not through our 20/20 lenses, but that of a trial judge. He thought that to subject an accused to trial and conviction in which evidence (and actions) resulted from an obvious, insupportable, mistake by the counsel charged with protecting his interests, was to subject him to an *unconstitutional* trial. That he rebelled from such a thought should merit our commendation, not the condemnation of that demeaning sobriquet: abuse of process.

Long after Mr. Logan will have served both his initial sentence and the one following this verdict of guilt, the countless hundreds of persons cowing before the August tribunal of a United States District Judge will have to realize that unlike their predecessors they cannot count on the Federal trial Judge to save their trial from a constitutional wrong.

Believing in the necessity for a wide power of discretion in every Federal trial Judge, to determine whether an injustice has been done, I must respectfully dissent.