844 F.2d 1193
 Fed. Sec. L. Rep. P 93,770, 11 Fed.R.Serv.3d 85,
RICO Bus.Disp.Guide 6947
 SMITH INTERNATIONAL, INC., Etc., Plaintiff,
Ajax Magnethermic Corp., Baird Corp., Motion Industries,
Inc., John R. Peterson, Inc., Marvin Howard Peck,
Newage Industries, Inc., and Production
Tool Sales, Inc., Plaintiffs-Appellants,
v.
TEXAS COMMERCE BANK, National Association, et al.,
Defendants-Appellees.
 No. 86-2841.
 United States Court of Appeals,
Fifth Circuit.
 May 18, 1988.
 
 Stephen D. Susman, Barbara Lowe, Susman, Godfrey & McGowan, Houston, Tex., for Baird Corp., Ajax Magnathermic Corp., et al.
 Joe M. Kirkham, Wendy Siceloff, Kirkham & Siceloff, Carole R. Riggs, Campbell & Riggs, Houston, Tex., for Marvin Howard Peck.
 Douglas S. Johnston, Houston, Tex., for John R. Peterson, Inc.
 Van E. McFarland, Houston, Tex., for Production Tool Sales, Inc.
 Christopher B. Allen, Liddell, Sapp, Zively, Brown & LaBoon, Houston, Tex., for Texas Commerce Bank.
 Michael P. Graham, David P. King, Houston, Tex., for John F. Carter, II, et al.
 Appeals from the United States District Court for the Southern District of Texas.
 Before THORNBERRY, GARWOOD, and HIGGINBOTHAM, Circuit Judges.
 GARWOOD, Circuit Judge:
 
 
 1
 Plaintiffs-appellants and their attorney appeal the district court's grant of defendants-appellees' motions for sanctions pursuant to Fed.R.Civ.P. 11 and 28 U.S.C. Sec. 1927. We vacate and remand.
 
 Facts and Proceedings Below
 
 2
 The underlying action consists of consolidated suits by plaintiffs-appellants, who are some of the trade creditors of Tubulars Unlimited (Tubulars), against Tubulars and its president, Tublars' attorneys, Texas Commerce Bank (TCB), which had made Tubulars a construction loan, a TCB officer and certain others, under the Securities Act of 1933, the Securities Exchange Act of 1934, and the Racketeer Influenced and Corrupt Organizations Act (RICO). The district court granted defendants' motion for summary judgment and dismissed the suits. No appeal has been taken from that ruling. Subsequently, the court granted defendants' motion for sanctions, and it is this action which the present appeal challenges.
 
 
 3
 In July 1981, Tubulars began construction on a pipe threading and heat treating facility in Brookshire, Texas. To finance this construction, Tubulars borrowed over $13,000,000 from defendant-appellee TCB. As part of this transaction, TCB acquired a first lien on all of Tubulars' real and personal property. Defendant-appellee John McGee, one of TCB's vice presidents, was given the task of overseeing this loan.
 
 
 4
 While the facility was still under construction, plaintiffs sold certain equipment to Tubulars on open account. However, because of the general downturn in the oil industry in early 1982 and the consequent reduction in demand for Tubulars' services, Tubulars was unable to pay these accounts as they became due. In response to Tubulars' rapidly deteriorating financial situation, Tubulars' management developed a four-point financial plan pursuant to which the company's smaller trade creditors (those with claims below $10,000) would be paid in full and its larger trade creditors (those with claims above $10,000) would be offered Tubulars one-year promissory notes. Before attempting to implement this plan, defendant-appellee Robert Donaldson, Tubulars' president, called defendant-appellee John F. Carter, II, an attorney at defendant-appellee Hutcheson & Grundy, to discuss the legal aspects of the plan. Subsequent to this discussion, Donaldson sent Hutcheson & Grundy the draft of a letter that he proposed to send to Tubulars' larger creditors, which another Hutcheson & Grundy attorney reviewed. Donaldson also requested that Hutcheson & Grundy prepare a draft of the promissory note that Tubulars planned to submit to its larger creditors, which a third Hutcheson & Grundy attorney did.
 
 
 5
 Between July and October 1982, Tubulars offered its one-year, unsecured promissory notes to each of its larger trade creditors in the amount of each creditor's trade debt plus interest at one point above the prevailing prime rate. Hoping that they would help Tubulars regain financial health and thereby recover the amounts they were owed, plaintiffs accepted these notes. Throughout this period, McGee was monitoring Tubulars' financial situation fairly closely, at one point holding weekly breakfast meetings with Tubulars' management. Despite the efforts of Tubulars' management, Tubulars' four-point financial plan did not prove to be a success. As a result, on April 5, 1983, TCB foreclosed on Tubulars' realty and fixtures. Two months later, TCB foreclosed on Tubulars' machinery, equipment, and other personal property.
 
 
 6
 Because Tubulars had failed to pay its promissory notes, in July 1983, plaintiff-appellant Smith International asked attorney Gerald Burleson to take action to recover on Smith International's $166,000 promissory note. Appellant Burleson talked with someone at Smith International who had knowledge of the transaction involving the promissory note; he also talked with Tubulars' president, Donaldson. On the basis of the information thus acquired, Burleson filed suit on August 9, 1983, on behalf of Smith International against Tubulars, Donaldson, and TCB.
 
 
 7
 In the spring of 1984, Burleson attended a meeting of Tubulars' creditors at which he met other trade creditors who had not been paid on their one-year Tubulars notes. Following this meeting, some of these creditors (but not including any who were or became parties to this suit) decided to file an involuntary petition against Tubulars under Chapter Seven of the Bankruptcy Code, 11 U.S.C. Secs. 701-766, which they did on April 4, 1984. Others of these one-year-note creditors, however, decided to retain Burleson as counsel and to pursue the course of action being taken by Smith International. Thus, on July 16, 1984, Burleson filed a second suit on behalf of Ajax Magnethermic and the remaining plaintiffs-appellants. This second suit named additional defendants, including Carter, Hutcheson & Grundy, and McGee. Subsequently, these two suits were consolidated, and the complaint was amended to permit Smith International to proceed against the additional defendants.
 
 
 8
 Between October 1984 and May 1985, Burleson deposed defendants and conducted other discovery. On June 12, 1985, after discovery had ended, the complaint was amended to add a claim against TCB under RICO, 18 U.S.C. Secs. 1961-1968. On September 23, 1985, the complaint was amended for the final time. At that point, the claims stood as follows. In Count One, all plaintiffs except appellant Marvin Howard Peck (Peck)[1] sued all defendants under section 12(2) of the Securities Act of 1933, 15 U.S.C. Sec. 77l (2). In Count Two, all plaintiffs except Peck[2] sued all defendants except MEI Energy, Inc. under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. Sec. 240.10b-5. In Count Three, Smith International sued Tubulars, Donaldson, and TCB under section 12(1) of the Securities Act of 1933, 15 U.S.C. Sec. 77l (1). And in Count Four, all plaintiffs sued TCB under RICO. The securities counts were based on the one-year notes being securities. The RICO count relied on the asserted securities laws violations for some, but not all, of the predicate acts charged.
 
 
 9
 On October 30, 1985, defendants filed a motion for summary judgment. On May 14, 1986, the district court granted defendants' motion for summary judgment on the grounds that the promissory notes were not securities as a matter of law and the evidence did not support a showing of a pattern of racketeering activity. On June 18, 1986, TCB and McGee filed a motion for sanctions against plaintiffs and Burleson pursuant to Fed.R.Civ.P. 11 and 28 U.S.C. Sec. 1927. On the following day, Carter and Hutcheson & Grundy filed a motion for sanctions pursuant to Fed.R.Civ.P. 11. On September 12, 1986, the district court granted these motions for sanctions and ordered appellants to pay $180,000 to TCB and $50,000 to Hutcheson & Grundy. For all these amounts, all plaintiffs and attorney Burleson were made jointly and severally liable. This appeal followed.
 
 Discussion
 
 10
 We recently gave thorough consideration to Rule 11 in Thomas v. Capital Security Services, Inc., 836 F.2d 866 (5th Cir.1988) (en banc), which was handed down well after the district court's action in this case. Under Thomas, it is clear that appellate review of orders granting or denying sanctions is on an abuse of discretion basis. Id. at 872-73. This is also the basis on which we review determinations under 28 U.S.C. Sec. 1927. See Jackson Marine Corp. v. Harvey Barge Repair, Inc., 794 F.2d 989, 992 (5th Cir.1986); In re Hunt, 754 F.2d 1290, 1294 (5th Cir.1985). However, in this connection, as we recognized in Thomas: "[L]egal issues may be subsumed within a group of issues generated by a district court's decision on sanctions." 836 F.2d at 873. This is likewise true of section 1927 review. While Thomas adopted "a rule ... that does not require specific findings and conclusions by a district court in all Rule 11 cases," nevertheless we there held that where "the basis and justification for the trial judge's Rule 11 decision is not readily discernible" some explanation is ordinarily required, though "the degree and extent to which specific explanation must be contained in the record will vary according with the particular circumstances of the case, including the severity of the violation, the significance of the sanctions, and the effect of the award." Id. at 883. "If the sanctions imposed are substantial in amount"--as they clearly are here--then "appellate review of such awards will be inherently more rigorous" and "such sanctions must be quantifiable with some precision." Id. We believe all these comments are equally applicable to section 1927.
 
 
 11
 Thomas also teaches that in fixing the character and extent of sanctions district courts are to be guided by "the principle that the sanction imposed should be the least severe sanction adequate to the purpose of Rule 11." Id. at 878. Though some sanction for any violation is mandatory, nonmonetary and noncompensatory sanctions are authorized. Id. With reference to Rule 11's authorization of sanctions in the form of compensation to the opposing party, Thomas emphasizes that "the expenses reimbursed must (1) be found to have been caused by a violation of Rule 11, and (2) be found to be reasonable." Id. at 878-79. Reasonableness "must be considered in tandem with the rule's goals of deterrence, punishment and compensation." Id. at 879. Thomas also clearly infers that an appropriate sanction in a given case may be an award to the adversary of some amount less than all of its reasonable expenses incurred as a result of the violation. Id. at 878 & n. 18, 879.
 
 
 12
 By its terms, Rule 11 imposes at least three affirmative obligations on an attorney who signs a pleading, motion, or other paper on behalf of a party. These affirmative duties include (1) a duty to conduct "reasonable inquiry" into the facts supporting the document, (2) a duty to make "reasonable inquiry" into the law supporting that document to ensure that it "is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law," and (3) a duty not to interpose the document "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." See Thomas, 836 F.2d at 873-74. And in Thomas, we rejected the theory of our previous panel decisions that Rule 11 imposed, respecting any one particular document, an independent obligation which continued beyond the time of its filing. Id. at 874-75.
 
 
 13
 Rule 11 expressly authorizes sanctions against the offending attorney, the client, or both. Section 1927, in contrast, does not apply to represented parties, but only to "[a]ny attorney or other person admitted to conduct cases," and does not expressly impose affirmative obligations. However, it does permit a federal court to assess "the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct" against an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. Sec. 1927.
 
 
 14
 In its May 14, 1986 memorandum and order granting defendants summary judgment, the district court focused almost entirely on a legal and factual analysis supporting its ultimate conclusion "that the promissory notes were not of the required investment character which would enable the Plaintiffs to bring a cause of action under the securities laws." The only other matter addressed in that memorandum was the RICO claim, which the court dealt with merely by saying that "the undisputed facts do not support a showing of a RICO claim. The evidence does not support a showing of a pattern of racketeering activity required pursuant to the statute or the case law. See Sedima v. Imrex Co., [473 U.S. 479] 105 S.Ct. 3275 [87 L.Ed.2d 346] (1985)."In its subsequent order for sanctions, the court's primary, indeed almost exclusive, focus was on the proposition that the notes were not securities:
 
 
 15
 "The Court expressed concern to Plaintiffs' counsel at the outset of the litigation about the viability of Plaintiff's allegations in their Complaint. At the first pretrial conference in January of 1984, the Court expressed at some length its concern how the Plaintiffs could make a federal securities act allegation out of what appeared to be a straight commercial transaction. The case involved the giving of promissory notes by a company to its trade creditors in acknowledgement of its existing trade debts. Later in the litigation when Mr. Burleson sought leave to amend the Plaintiffs' Complaint to allege a violation of the Racketeer Influenced and Corrupt Organizations Act ('RICO') solely against the Bank, the Court instructed him to consider Rule 11 at that time.
 
 
 16
 "Based upon the facts and the law set forth in the Court's Order dated May 14, 1986 granting Defendants' Motion for Summary Judgment, the Court is of the opinion that the Plaintiffs and Mr. Burleson at the time of the filing of this litigation had no factual or legal support for their position that the promissory notes in question were securities pursuant to the federal securities laws. The applicable law cited in the Order was well established for some time prior to the filing of the litigation."
 
 
 17
 While the court went on to say that it "is further of the opinion that the Plaintiffs could never have established that they suffered any loss in view of the fact that they exchanged a worthless debt for a worthless promissory note," this was not a ground mentioned in the summary judgment order and the sanctions order does not further elaborate on it. Given its relatively brief mention following the court's explicit reliance on the conclusion that the notes were not securities, and the fact that the court did not expressly indicate that the total worthlessness of the debts at the time the notes were issued should have been known to plaintiffs or their counsel when suit was filed, or at any other particular time thereafter, we are unable to conclude from the court's order that it would have imposed the same sanctions on this ground alone. Moreover, such a brief recitation is simply not sufficient to authorize meaningful review of these rather sizable across-the-board sanctions if they are to rest only on this basis.
 
 
 18
 With respect to the RICO claim, the district court's sanctions order merely states:
 
 
 19
 "Finally, late in the litigation, the Plaintiffs amended their Complaint alleging that the Bank had violated the RICO Act. These allegations were made after discovery had occurred which reflected a total absence of evidence to support such allegations. This action by Plaintiffs and Mr. Burleson compounded the injury done by the original filing by injecting the allegation of 'racketeering' into the case."
 
 
 20
 We are similarly unable to conclude that the district court would have imposed the same sanctions as it did on the basis of the RICO claim alone. To begin with, the RICO claim was only against TCB, and hence would not have justified the sanctions in favor of Hutcheson & Grundy. Moreover, as to TCB, the sanctions awarded were apparently for its full litigation expenses, while the RICO claim was not added until very late in the proceedings below. Further, neither the district court's summary judgment order nor its sanctions order clearly identifies the particular deficiency or deficiencies which the court found in the RICO claim, although the former order refers generally to an absence of evidence of a pattern of racketeering activity. Since the RICO claim relied, in significant part, on alleged securities violations as predicate acts, it may well be that the district court's holding that the notes were not securities and that suit was hence frivolous when instituted, influenced its apparent determination that inclusion of the RICO claim was also a violation of Rule 11.
 
 
 21
 Accordingly, as we must address the case, the central issue is whether the district court "abused its discretion" in determining that plaintiffs' claim that the notes were securities was sanctionable under Rule 11.[3] This determination was apparently not made because the plaintiffs or their counsel had not reasonably investigated the basic, historic facts, but rather because the district court concluded that under no reasonable understanding of the law did such facts, however viewed, justify the claim that these notes were securities for purposes of the Securities Act or the Securities Exchange Act. In substance, the district court concluded that the claim that the notes were securities was made in violation of Rule 11's requirement that the pleader act on "knowledge, information, and belief formed after reasonable inquiry" that the claim asserted "is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." Obviously, this aspect of Rule 11 cannot be violated if the challenged claim is legally correct. However, we agree with the district court that, under the undisputed evidence, the notes were not securities because both the form and economic realities of the transaction in which the notes were issued demonstrate that they were of a commercial rather than an investment nature.[4]
 
 
 22
 But, of course, this is not the end of the inquiry. Merely because plaintiffs and their counsel were mistaken as to the law does not mean that the mistake was unreasonable. Rule 11 does not make the signature on a pleading or other covered document an absolute guarantee as to the correctness of the theory of law on which it is grounded, but only that "reasonable inquiry" has been made in that respect. Moreover, Rule 11 allows for "a good faith argument for the extension, modification, or reversal of existing law." This is not to say that Rule 11 allows the latter type argument to be made on no more than subjective good faith, for its structure plainly reflects that the "reasonable inquiry" requirement is also applicable there, and to hold otherwise would be inconsistent with the purpose of the 1983 Rule 11 amendments to largely replace the former "subjective good faith" standard with the "standard of reasonableness under the circumstances." Thomas, 836 F.2d at 870.
 
 
 23
 The question here then becomes whether plaintiffs' legal theory that the notes were securities, though erroneous, can fairly be said to be unreasonable from the point of view both of existing law and of its possible extension, modification, or reversal. We think not.
 
 
 24
 Plaintiffs in this connection relied primarily on our decision in Securities and Exchange Commission v. Continental Commodities Corp., 497 F.2d 516 (5th Cir.1974). In Continental Commodities, the California Commissioner of Corporations ordered Continental Commodities Corporation (Continental), a trading company specializing in naked options on commodities futures contracts, to stop selling unregistered options and to cancel its outstanding options. The basis for this order was that the West Coast Commodities Exchange (Exchange), of which Continental was a member, had classified all commodities options as securities. Although Continental may have had sufficient funds to pay in full all its customers' original investments, it in any event wanted to keep enough cash in the company to enable it to sue the Exchange and to register its options should that become necessary. To help Continental stay in business, certain large customers agreed to take forty percent of the amounts owed them in promissory notes and to forbear collection of those amounts if the notes were paid according to their terms. After review, this Court determined that these notes were securities, noting that "[o]nce the resuscitative nature of the notes is established, the conclusion is ineluctable that the notes were investment and not commercial paper." Id. at 527.
 
 
 25
 The opinion in Continental Commodities is somewhat unclear as to certain aspects of the operative facts there. The notes are described variously as being "partial reimbursement to customers who held open accounts with Continental" and as a forty percent "return ... of the investors' original investments," with the remaining sixty percent thereof being refunded in cash. 497 F.2d at 519; see also id. at 527. The reference to reimbursing "open accounts" suggests that the customers may have retained some right to all or some of their options, while the contrary is suggested by the concept of returning, by cash and notes, all of the customers' "original investments." Even in the latter circumstance, however, it is conceivable that the customers would have retained their options, or at least the right to acquire them at their original cost. This is suggested by the language in the opinion that Continental's plan, apparently communicated to its customers in connection with the notes transactions, was to "register its options, and resume trading." Id. The same suggestion arises from the opinion's language that the "recipients accepted the notes with the hope of realizing a greater return on their investments." Id. at 527. In this context, "their investments" could refer to existing options or rights which the customers had through Continental apart from the right to be repaid the amounts represented by the notes. Or, "their investments" might simply refer to the indebtedness represented by the notes. The latter interpretation tends to make Continental Comodities more analogous to the present case than the former. It is not possible to tell from the Continental Commodities opinion itself which is the correct interpretation.
 
 
 26
 Another aspect of Continental Commodities bears mention. In part II of that opinion, we held that the discretionary accounts for trading in options on commodities futures contracts which Continental maintained were securities. Id. at 520-23. In part III of the opinion, we turned to consider the notes, id. at 523-27, which we had earlier indicated were given to these same customers either for forty percent of their then account balances or of all they invested in this manner through Continental. Id. at 519. These noteholders, then, achieved their status as such by virtue of having been securities investors with Continental. Their relationship with Continental, and its notes, accordingly arose out of their investment in Continental's securities. While, as previously observed, the portion of our opinion there dealing with the notes states that the "recipients accepted the notes with the hope of realizing a greater return on their investments," id. at 527, it nevertheless nowhere either expressly attaches significance to the investment character of the transaction giving rise to the indebtedness represented by the notes or predicates the holding in part III on that in part II.
 
 
 27
 In the present case, plaintiffs argue that they, like the noteholders in Continental Commodities, accepted Tubulars' promissory notes in the hope of resuscitating the company and that, therefore, the promissory notes they received from Tubulars are securities under the federal securities laws. We disagree, believing that the better reading of Continental Commodities does not extend so far, and that the result there is dependent on the investment nature of the transaction giving rise to the preexisting debt which the notes represented and/or on the creditor's otherwise having an investment interest in the debtor apart from the debtor's unconditional obligation to pay the specified note principal and interest. We have, however, been cited to no decision expressly determining whether or not Continental Commodities is so limited. In the district court's opinion, the distinction between the present case and Continental Commodities was patent. In our view, however, the distinction between the two cases is less apparent. Hence, although we agree with the district court's conclusion that the notes in question were not securities, we do not believe that the reasoning of Continental Commodities was so clear or its facts so plainly inapposite as to prevent a reasonable attorney from contending on the basis of it that the present notes were securities. On the contrary, we view the facts of the two cases as arguably sufficiently similar and the reasoning of Continental Commodities as sufficiently unclear to permit an attorney to make a plausible, though ultimately flawed, argument that Continental Commodities should apply in a case such as this.
 
 
 28
 Accordingly, although we agree with the district court's resolution of the securities law issue on the merits, we disagree with its determination that the law in this respect was so clear and well fixed that the plaintiffs' legal theory was unreasonable both as a matter of existing law and as a request for its modification or extension. We hold that the district court exceeded the scope of its discretion in determining that the plaintiffs' legal theory that the notes were securities was unreasonable for purposes of Rule 11. For the reasons previously given, this requires that the award of sanctions be vacated and remanded to the district court for reconsideration in light of our holding in this respect.[5]
 
 
 29
 Finally, even if the district court's reasons for awarding sanctions against appellants were both clear and correct, we would nonetheless be forced to remand this order because of the court's failure to apportion this award among the individual appellants. Rule 11 instructs the district courts that when a pleading, motion, or other paper is signed by an attorney in violation of Rule 11, the district court shall impose "an appropriate sanction" on the attorney, the party, or both. In the present case, the district court ordered that the entire sanctions against plaintiffs and Burleson be imposed jointly and severally. Although joint and several liability for sanctions may be appropriate in some cases, see, e.g., Robinson v. National Cash Register Co., 808 F.2d 1119, 1132 n. 22 (5th Cir.1987); Southern Leasing Partners, Ltd. v. McMullan, 801 F.2d 783, 789 (5th Cir.1986), we do not believe that it is appropriate in this case. Smith International was involved in the litigation for nearly one year before the other plaintiffs. Moreover, there are significant differences in the number of claims that each plaintiff asserted. For example, although most plaintiffs sued defendants on three of the four counts, by the end of the litigation Peck had dropped both of his securities claims and was asserting only one claim, a RICO claim, against only one defendant, TCB. We believe that differences of this sort must be considered in determining what amounts are appropriate under Rule 11. As noted, Thomas teaches us that compensatory Rule 11 sanctions may not exceed the opponent's reasonable expenses caused by the Rule 11 violation, 836 F.2d at 879, and where, as here, such sanctions are "substantial in amount" they "must be quantifiable with some precision" and explained by the court with appropriate specificity. Id. at 883. Here, as best we can tell, the district court's award represents its calculation of the total of all reasonable expenses occasioned by all Rule 11 violations by all plaintiffs. On these facts, this is contrary to Thomas.
 
 Conclusion
 
 30
 Because we find the district court's order awarding sanctions against appellants was premised at least in significant part on an erroneous view of the law respecting the reasonableness of plaintiffs' claim that the notes were securities, we vacate the sanctions order and remand the matter of sanctions to the district court for reconsideration in light of this holding. Moreover, as the district court did not have the benefit of our en banc opinion in Thomas, it should reconsider not only whether and in what respect or respects the various plaintiffs (and Burleson) violated Rule 11, but also the nature and extent of the sanctions appropriate thereto, in light of Thomas. See Foval v. First National Bank of Commerce in New Orleans, 841 F.2d 126, 130 (5th Cir.1988). We further direct that if the district court determines that compensatory sanctions are appropriate, it apportion such sanctions among the offending appellants in a manner that reflects the extent and result of each appellant's individual violations of Rule 11 (and section 1927 respecting Burleson). The court's order should have sufficient explanation in accordance with the Thomas standards.[6]
 
 
 31
 VACATED and REMANDED.
 
 
 
 [1]
 Until the complaint was amended for the final time, Peck had asserted a section 12(2) claim against defendants
 
 
 [2]
 Again, until final amendment of the complaint, Peck had asserted a claim under section 10(b) and Rule 10b-5
 
 
 [3]
 We observe again, as we have before, that "abuse of discretion" is a phrase which "sounds worse than it really is." See, e.g., United States v. Walker, 772 F.2d 1172, 1176 n. 9 (5th Cir.1985). It is simply a legal term of art which, properly understood, carries no pejorative connotations of a professional or personal nature. We imply no criticism of the district court, only disagreement with it, primarily on the degree of clarity in the established securities law
 
 
 [4]
 See, e.g., Bellah v. First National Bank, 495 F.2d 1109, 1113 (5th Cir.1974); McClure v. First National Bank, 497 F.2d 490, 493-94, reh'g denied, 502 F.2d 1167 (5th Cir.1974), cert. denied, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); Reid v. Hughes, 578 F.2d 634 (5th Cir.1978); National Bank of Commerce v. All American Assurance Co., 583 F.2d 1295, 1301 (5th Cir.1978); United American Bank v. Gunter, 620 F.2d 1108, 1115 (5th Cir.1980); Williamson v. Tucker, 645 F.2d 404 (5th Cir.1981). See also United States v. Namer, 680 F.2d 1088, 1092 (5th Cir.1982). The plaintiffs were not and had never been investors in Tubulars, but were merely its trade creditors whose preexisting trade debt was memorialized by an ordinary promissory note by their trade debtor whose obligation on which (as to both principal and interest) was fixed and in no way contingent upon the maker's success. The plaintiffs parted with nothing (except their right to bring immediate suit) and received no investment rights, but only the written obligation of their trade creditor to repay on schedule the fixed principal of their preexisting trade debt with the specified interest. The notes were in "order," not bearer, form, contained full prepayment privileges, and provided for acceleration of maturity and attorneys' fees. See Amfac Mortgage Corp. v. Arizona Mall of Tempe, 583 F.2d 426, 433-34 (9th Cir.1978)
 While both the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78c(a)(10), and the Securities Act of 1933, 15 U.S.C. Sec. 77b(1), define a security as including "any note," it is nevertheless well settled that these definitional sections are not read literally because "Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto," United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975), and "an instrument which seems to fall within the broad sweep of the Act is not to be considered a security if the context otherwise requires." Marine Bank v. Weaver, 455 U.S. 551, 102 S.Ct. 1220, 1225, 71 L.Ed.2d 409 (1982). See also id. 102 S.Ct. at 1223. Cf. Landreth Timber Co. v. Landreth, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985).
 Given the foregoing decisions, it is simply too late in the day to successfully contend that the literal statutory definitions of themselves mean that it can always be reasonably argued that any note (or any for more than nine months) is a security no matter what the circumstances.
 
 
 [5]
 We recognize that Rule 11 also prohibits the interposition of pleadings or other covered documents "for any improper purpose, such as to harass." This is a subjective-type test. It is unlikely but theoretically possible that an objectively reasonable position may be taken for a subjectively improper purpose condemned by Rule 11. That, however, is not the tenor of the district court's sanctions order, or of its remarks at the sanctions hearings. Moreover, if the district court did find subjectively improper motive--and it is not clear to us that it did--this finding may well have been infuenced by its mistaken view that plaintiffs' legal position that the notes were securities was objectively unreasonable. This same analysis prevents us from sustaining the award against attorney Burleson under section 1927
 
 
 [6]
 We do not pass on the other points raised by appellants, and we leave to the district court in the first instance to determine on remand whether there were (except as we have herein held otherwise) any Rule 11 (or section 1927) violations and the appropriate sanctions in respect thereto under Thomas